No. 123,707

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interest of E.L., A Minor Child.

SYLLABUS BY THE COURT

1.

A requirement that a parent undergo a clinical or substance abuse evaluation in a child in need of care proceeding does not violate that parent's Fifth Amendment right under the United States Constitution against self-incrimination.

2.

When deciding whether to terminate parental rights, a district court's consideration of a parent's failure to comply with a court order to undergo a clinical or substance abuse evaluation in a child in need of care proceeding does not violate that parent's Fifth Amendment right under the United States Constitution against self-incrimination.

3.

A parent's demonstrated lack of willingness to participate in treatment may be considered in determining whether the State has made active efforts to reunify an Indian family under the Indian Child Welfare Act.

Appeal from Sedgwick District Court; KELLIE HOGAN, judge. Opinion filed November 24, 2021. Affirmed.

*Jordan E. Kieffer*, of Jordan Kieffer, P.A., of Bel Aire, for appellant natural mother.

*Julie A. Koon*, assistant district attorney, and *Marc Bennett*, district attorney, for appellee.

Before GREEN, P.J., CLINE, J., and BURGESS, S.J.

CLINE, J.: E.L. was taken from B.S. (Mother) shortly after birth, based mainly on evidence of significant physical abuse of E.L.'s older sibling, D.L., Mother challenges the sufficiency of the evidence in support of the district court's eventual termination of her parental rights to E.L. under Kansas law and its determination under the Indian Child Welfare Act (ICWA) that the State made "active efforts" to prevent the breakup of the Indian family. She also claims the court should have excluded the State's expert witness from the termination hearing since the State did not provide an expert witness disclosure under K.S.A. 2020 Supp. 60-226(b)(6).

We find clear and convincing evidence supports the district court's termination of parental rights. We also find there was clear and convincing evidence that the State made active efforts under ICWA to prevent the breakup of the Indian family. We find evidence beyond a reasonable doubt supports the district court's determination that continued custody of E.L. by the parents was likely to result in serious emotional or physical damage to E.L. Last, we find Mother has not established the State had to disclose its expert. We affirm the district court's judgment.

FACTS

On October 21, 2019, officers were dispatched to Saint Joseph Hospital in Wichita, Kansas, for a welfare check of a newborn baby, E.L. When they arrived, a hospital social worker reported that multiple nurses and doctors had complained Mother was not following their instructions on how to properly care for E.L. Nursing staff had to educate the teenage parents multiple times on how to hold E.L. and on safe sleep, out of concern the parents were not supporting E.L.'s head and were laying E.L. in ways that were obstructing E.L.'s airway. Nursing staff also twice counseled Mother about overfeeding E.L. Mother resisted their advice and instructions. Upon contacting the

2

Kansas Department for Children and Families (DCF), the hospital social worker learned Mother was flagged for a pending child endangerment case. The parents lost custody of D.L. about a year before, after his admittance to the hospital at five months old with multiple fractures.

Upon being contacted regarding E.L., a DCF social worker, Marisa Thorne, interviewed the parents at the hospital. When Thorne asked about D.L.'s case, they denied knowing how D.L. was injured and even denied that he sustained any injury at all. They both accused the hospital of mixing up D.L.'s x-rays because they claimed the date of birth they had seen on the x-rays was incorrect.

*Initiation of CINC proceedings*

After the State initiated child in need of care (CINC) proceedings, the district court placed E.L. in the temporary custody of DCF and ordered DCF or its designee to prepare a case plan. The court also found ICWA applied, since Mother is an enrolled member of the Citizen Potawatomi Nation (the Tribe).

On November 21, 2019, both parents received the same case plan from DCF's designee, Saint Francis Ministries (SFM). The plan required each parent to complete the following: (1) sign all necessary releases for SFM; (2) obtain and maintain appropriate housing; (3) obtain and maintain full-time employment and provide documentation to SFM; (4) abstain from the use of illegal drugs, alcohol, and any prescription medication without a valid prescription throughout the duration of the case; (5) complete a substance abuse evaluation and follow all recommendations; (6) submit to random urinalysis (UA) and hair follicle testing; (7) complete a series of domestic violence classes; (8) complete a WASAC protective parenting class; and (9) complete a clinical assessment and follow any resulting recommendations.

3

At the November 25, 2019 adjudication hearing, the district court granted the Tribe's motion to intervene. Upon the State's request, the court placed E.L. in an Indian home, which the Tribe selected and where E.L.'s sibling, D.L., was located. Since the Tribe-approved home was in Oklahoma, the Tribe agreed to transport E.L. to Wichita for weekly visits with the parents. An evidentiary hearing was set for February 26, 2020.

Relying mainly on D.L.'s injuries, the State moved to terminate the parental rights of both parents a few weeks later, based on:

- K.S.A. 2020 Supp. 38-2269(b)(2)—conduct toward a child of a physically, emotionally, or sexually cruel or abusive nature;
- K.S.A. 2020 Supp. 38-2269(b)(4)—physical, mental, or emotional abuse or neglect or sexual abuse of a child;
- K.S.A. 2020 Supp. 38-2269(b)(6)—unexplained injury or death of another child or stepchild of the parent or any child in the care of the parent at the time of injury or death; and
- K.S.A. 2020 Supp. 38-2269(b)(8)—lack of effort on the part of the parent to adjust the parent's circumstances, conduct, or conditions to meet the needs of the child.

At the February 26, 2020 adjudication hearing, the district court found E.L. to be a child in need of care and scheduled a hearing on the termination of parental rights. In the meantime, it adopted the case plan as orders of the court and ordered that visitation be at the discretion of DCF or DCF's designee.

*Visitation issues*

On March 17, 2020, the Tribe notified SFM that it had issued an out-of-state travel ban because of the COVID-19 pandemic, so it could no longer transport E.L. for weekly visits to Kansas. The Tribe offered to reimburse the parents for their travel costs if they

would be willing to travel to Oklahoma for in-person visits. The Tribe understood that while neither parent had a vehicle, Mother's parents had one.

The parents did not travel to Oklahoma for visitation, so SFM set up weekly virtual visits with E.L. The virtual visits were SFM's idea. SFM personnel contacted the Tribe at least monthly, and sometimes multiple times per month, to ask about the travel ban and the Tribe's ability to transport E.L. for in-person visits. The Tribe lessened its travel restrictions on September 2, 2020, but it was only able to transport E.L. for in-person visits once per month because of a staff shortage. The Tribe offered to arrange for additional in-person visitation at another tribe's facility in Tonkawa, Oklahoma, to minimize the parents' drive, but the parents were unable to take advantage of this offer. SFM arranged for the virtual visits to continue, so the parents then had one in-person and three virtual visits each month.

*Termination hearing*

The district court held a termination hearing for both parents on October 26 and 27, 2020. The State presented testimony from several witnesses, including two law enforcement officers and a physician involved in D.L.'s case, along with social workers involved in E.L.'s case from the Tribe, DCF (Thorne), and SFM. Father testified and called another SFM social worker to testify on his behalf. Mother testified and called her juvenile case worker to testify on her behalf.

1. *D.L.'s injuries*

Dr. Kerri Weeks, a child abuse pediatrician who has been involved in the child-at-risk evaluation team for over 10 years, testified about her consultation on D.L.'s injuries. She said D.L. was five months old when the parents brought him to the hospital on September 11, 2018, for right leg pain. The parents provided no history of trauma, and he

had visible bruising. The parents reported D.L. had just rolled over for the first time the prior week.

During D.L.'s examination, hospital staff discovered several injuries: (1) a recent right femur fracture, (2) a skull fracture of undetermined age, (3) an older proximal right radius fracture that was healing, and (4) two rib fractures. Dr. Weeks explained that any fracture in a nonmobile infant like D.L. is concerning because, at that age and stage of development, they are unable to injure themselves. She also indicated there should be an adequate history explaining the injury.

Dr. Weeks believed D.L.'s femur fracture was an abusive injury. She dismissed Mother's later explanation that D.L.'s foot had been caught in his crib slats as a possible cause. While she believed the skull fracture was the only injury that could have potentially been accidental, in the context of the many other abusive injuries, she believed it was also an abusive injury. She testified the pattern of bruises in the soft part of D.L.'s cheek is a common pattern in young infants with abuse, and rib fractures are also highly associated with infant shaking and abusive head trauma. The combination of skull and rib fractures also evidenced abuse since these injuries are seen together in abusive head trauma. She explained how the x-rays revealed the fractures happened at different times, since the right radius and rib fractures showed signs of healing. The different time frames for the fractures led her to believe the abuse was ongoing.

Dr. Weeks described the necessity for a follow-up consultation in two weeks for young children suffering from suspected abuse, to look for more fractures which may have been difficult to see on the initial visit. D.L.'s follow-up consultation revealed two more fractures, one in his right ulna and one in his left humerus. She confirmed these two fractured arms also suggested abuse in a five-month-old child. In her opinion, D.L. was physically abused several times. Dr. Weeks testified she believed if D.L. was returned to

6

the parents, he would end up dead since the abuse was progressing. She said she would be "very hesitant to put a child in an environment where this type of abuse has occurred."

2. *Investigation of D.L.'s injuries*

Jessica Helwi, a patrol officer with the Wichita Police Department, and LaTavia Allen, a detective from that department's exploited and missing child's unit, each testified about being called to the hospital on September 11, 2018, to investigate suspected abuse of D.L. Helwi discussed the doctor's report that D.L.'s diaper had not been changed for about 12 hours when the parents brought him. She mentioned a doctor observed Mother handling D.L. roughly, so the doctor and nurses stepped in to oversee Mother and ensure D.L. was not further harmed. She also recounted how the hospital staff first thought D.L. was very dirty, but later discovered he had bruises on his face and hands.

Helwi interviewed Mother, who first said she did not know what happened to D.L., but then later said he had gotten his leg stuck in between the crib slats the day before. When Helwi asked Mother about his other injuries, Mother told her she believed D.L. might be anemic or have a bone disease, which caused him to bruise easily.

Mother also told Allen later that she thought D.L. may have gotten his leg stuck in the crib and then rolled over, fracturing his leg. Mother told Allen that D.L. rolls around in his crib, and his foot was stuck in the crib that morning when she awoke. Allen said Mother showed her a video of D.L. rolling over for the first time, which was dated only four days before his hospital admission.

Allen had Mother go through a timeline, recalling all the events in the four days before D.L.'s hospital admission. Apart from Mother telling Allen that her own mother played with D.L. for about an hour the day before, Mother never mentioned that anyone other than herself and Father were around D.L. during this time.

7

Allen interviewed Mother again a few days later, after learning the extent of D.L.'s injuries. Mother told Allen that Father sometimes threw D.L. in the air and caught him, which could be a source for some of D.L.'s injuries. Mother also suggested some of the fractures could have occurred after D.L. slid out of the swing in which they sometimes put him to sleep. Mother told her D.L. woke up at 5 a.m. screaming on the floor three days ago because he had slid down out of the swing onto the floor. Mother told Allen that D.L. had fallen out of the swing several times. Mother had no explanation for why both of D.L.'s arms were fractured. When Allen inspected Mother's home, the swing looked like it had not been used recently because there were clothes and water bottles inside it. She measured the space between the crib slats and discovered it was only two inches.

3. *Reintegration efforts*

Thorne, the DCF permanency specialist assigned to the intake of E.L.'s case, also testified. She explained how the hospital staff notified her of their concerns about the parents' care for E.L. and the parents' refusal to take direction from the hospital staff. She also discussed how the parents denied to her that D.L. was even hurt and downplayed the criminal and CINC investigation into D.L. Thorne testified she was concerned about sending E.L. home with the parents since both parents had substantiations for physical abuse on their son.

Tracey Humphrey, a qualified expert witness under ICWA and the Tribe's Indian Child Welfare case manager assigned to E.L.'s case, testified about the parents' visitation with E.L. She discussed the Tribe's travel ban and SFM's initiation of virtual visits during the ban. She also testified she would not be comfortable returning E.L. to the parents' custody. She believed SFM had made active but unsuccessful efforts to rehabilitate and prevent the breakup of the Indian family. She testified the parents had not changed their behavior or worked their services, including refusing to undergo drug tests and not allowing SFM into the home. She said she would be concerned for E.L.'s safety if E.L.

8

was returned to Mother and Father. In her opinion, continued custody with the parents would likely result in serious physical harm to E.L. She also testified she did not believe allowing the parents more time would be helpful, since they were unwilling to take advantage of the services offered to them. When asked, Humphrey admitted she was unaware of any additional services SFM could have offered to the parents that might have helped them succeed. She supported the State's motion to terminate both parents' parental rights to E.L. and believed termination would be in E.L.'s best interests.

Lavana Faine, the SFM case manager assigned to E.L.'s case also testified about the parents' visitation with E.L. She said SFM staff asked Humphrey all the time when the Tribe's out-of-state travel ban would be over and when the parents' in-person visits could resume. She testified that if SFM had not recommended the video visits, then the parents would have only seen E.L. once a month.

Faine also testified about a report she prepared for the termination hearing, which summarized SFM's efforts with the parents. She reported Mother completed a mental health evaluation on February 19, 2020, and the therapist recommended Mother receive therapy to deal with the current situation as well as improve her life skills and situation. When Faine addressed this recommendation with Mother, Mother replied that she "will not be engaging in therapy as she does not have time for that." Mother said therapy "will not help her as she has completed therapy before." Mother told Faine "all they do is accuse her of her son's injuries" in therapy, and she feels therapy does not work. When Mother also reported she was uninsured and unable to pay the $100 fee per session, Faine told her some places would charge on a sliding scale.

While Mother told Faine she was employed, she never provided proof of employment. Mother also never provided Faine with a release to review the psychological evaluation Mother claimed she had completed. Mother did not complete the ordered WASAC protective parenting class either.

9

Faine said she told Mother during their case management meetings that she could not send E.L. to a home without seeing it. Mother reported living with her parents, but Faine was never allowed to complete any home visits. Mother later told Faine her parents were moving, but Mother was not moving with them. Mother did not tell Faine whether she or her parents actually moved.

During the first day of the hearing, Faine testified she did not know where Mother was living. She testified she asked Mother before coming to the hearing where she was living, and Mother "chuckled a little" in response. The next day, Faine testified that, after the hearing had concluded the day before, Mother told her she was now living in an apartment. Faine said Mother told her she had lived in the apartment for two weeks but had purposefully kept this information from Faine because she did not want Faine showing up.

After Mother told Faine about the apartment, Faine asked if she could visit. Mother allowed Faine to come over later that evening. During her inspection of the apartment, Mother showed Faine one side of the bedroom closet, which contained women's clothing. When Faine viewed the other side of that closet, she discovered it was full of men's clothing. Faine testified Mother told Faine she used to be a "tomboy" who "wore a lot of men's clothes." Mother then claimed some of the shirts were her father's, who had taken her home after the hearing. Faine also found men's and women's deodorant in the bathroom. Mother claimed she used both. Faine found a pair of men's tennis shoes in the living room, exactly like the kind Father wore. When Mother put them on, they were too big for her. Faine suspected Father was living with Mother at the apartment. Faine was concerned about the couple living together since Father's last three hair follicle tests were positive for methamphetamines. The court had also ordered the parents not to have any contact with each other.

Faine reported Mother failed to complete her court-ordered UA tests in April, May, and June 2020. Mother's hair follicle test in June 2020 was positive for methamphetamine. Her UAs in July, September, and October 2020 were negative. Mother's hair follicle test in September 2020 was incomplete based on an error at the provider. Mother refused to return for a replacement hair follicle test, despite repeated requests and being advised that a failure to complete the test would be considered a positive test. Mother also failed to complete her required hair follicle test in October 2020.

After Mother missed some of her scheduled appointments for hair follicle and UA tests, Faine offered to take her to future appointments. Mother did not accept Faine's offer. Faine told Mother she needed to complete a substance abuse evaluation after she testified positive for methamphetamine, but she never completed one. Faine also testified she believed Mother was still in contact with Father despite the no-contact order. She testified they attended parenting classes together and completed their UAs at the same time on the same day.

Faine testified she would not be comfortable returning E.L. to the parents' custody, based on: (1) the seriousness of D.L.'s injuries, (2) the parents' failure to take responsibility for those injuries, (3) Mother's failure to engage in the recommended therapy, (4) both parents' positive hair follicle test, (5) Father's failure to engage in substance abuse evaluation or treatment, and (6) the lack of adequate housing. She said she did not believe the parents were likely to change in the foreseeable future since, from the beginning, they told her they were not going to comply with all the court orders. She testified she believed it was in E.L.'s best interests to permanently remain with D.L. and the foster parents with whom E.L. had bonded. She discussed the concept of "child time," meaning children perceive time differently than adults. She noted E.L. had been in DCF custody since she was four days old and was thriving with her foster parents and brother. Faine testified she supported the State's motion to terminate parental rights.

11

Father called Deanna Denson, a SFM social worker who scheduled and supervised visitations in E.L.'s case, to testify in his defense. Denson testified about SFM's efforts to communicate with the Tribe to ask about ending the travel ban and resuming in-person visits. Denson admitted that, in the beginning, the foster mother could be distracting during the virtual visits by playing with E.L. But she addressed the issue with the foster mother, which led to the foster father supervising the visits instead. Denson stated the visits supervised by the foster father proceeded without issue for a while. Once the parents informed her otherwise, she supervised the visits herself.

Mother presented testimony from Misty Jimison, her home-based supervision officer in her separate, juvenile offender case. Jimison testified Mother was compliant in her juvenile offender case, doing everything Jimison asked her to do.

4. *Testimony from parents*

When Mother testified, she provided several conflicting explanations for the men's items in her apartment. During questioning on direct, Mother said that after Faine left the apartment, she told Faine by text she was seeing another man. She also said she told Faine by text that she wore men's clothing when she was pregnant because girls' clothing did not fit, and she thought men's clothing was more comfortable. On cross-examination, Mother testified the men's deodorant and some of the men's clothing belonged to the man whom she had been seeing, although she denied that he spent the night at the apartment. She then testified on cross-examination that she uses the men's deodorant because she is allergic to the woman's deodorant in her bathroom. She also testified she wears the men's tennis shoes Faine found and denied the shoes did not fit her. She said she had been living in the apartment for three weeks, instead of the two weeks she had told Faine. She admitted Father's name was on the apartment lease but claimed he was only a cosigner.

Father denied living in the apartment and denied the clothing and shoes Faine found were his. He admitted his name is on the lease of the apartment. He claimed Mother's father asked him to help Mother out with the apartment, to help her get E.L. back. Father claimed he had not spoken to Mother in over a year.

Both parents admitted they work at the same Burger King but claimed they work during different shifts and denied seeing each other. They also denied participating together in virtual visits with E.L., despite Humphrey's testimony that they appeared to be in the same room during these visits.

### 5. *District court's ruling*

At the end of the hearing, the district court ultimately found both parents to be unfit under K.S.A. 2020 Supp. 38-2269(b)(2) (abusive conduct toward a child), (b)(4) (physical abuse or neglect of a child), and (b)(6) (unexplained injury of another child of the parent). The court also found the evidence of unfitness was unlikely to change in the foreseeable future, explaining, "[B]ecause here we are one year later, and we are no closer to being able to reintegrate this child than we were on the day that the child came into custody." The court noted its duty to consider child time and explained:

> "[E.L.] has spent 100 percent of her life in foster care, and there's just no evidence that the Court could rely on to believe that anything will be different in three or six months or even a year. We have had one year and we are just no closer than where we were."

The district court found it to be in E.L.'s best interests to terminate the parental rights of both parents.

Additionally, under ICWA, the district court found: (1) reasonable and active efforts were made to prevent the breakup of the Indian family and those efforts did not succeed and (2) there was evidence beyond a reasonable doubt (and supported by a

13

qualified expert) that the continued custody of E.L. by the parents was likely to result in serious emotional or physical damage to E.L.

ANALYSIS

Mother attacks the sufficiency of the evidence supporting the district court's termination under both Kansas law and ICWA. She also raises an evidentiary challenge to Dr. Weeks' testimony, claiming the State should have disclosed Dr. Weeks as an expert witness under K.S.A. 2020 Supp. 60-226. We do not find her arguments to be persuasive. We find clear and convincing evidence supporting the district court's termination, and, under the facts of this case, the State did not have to disclose Dr. Weeks under the revised Kansas Code for Care of Children (KCCC), K.S.A. 2020 Supp. 38-2201 et seq. See K.S.A. 2020 Supp. 38-2245.

*Standard of review*

In Kansas, the termination of parental rights is governed by K.S.A. 2020 Supp. 38-2266, which requires a finding by clear and convincing evidence that the parent is both unfit and the parent's unfitness is unlikely to change in the foreseeable future, followed by a determination by a preponderance of evidence that termination of parental rights is in the child's best interests. See K.S.A. 2020 Supp. 38-2269(a), (g)(1). Evidence is clear and convincing if it is "sufficient to establish that the truth of the facts asserted is 'highly probable.'" *In re B.D.-Y.*, 286 Kan. 686, 695-96, 187 P.3d 594 (2008). Thus, appellate courts will uphold termination of parental rights under Kansas law if, after reviewing all the evidence in the light most favorable to the State (as the prevailing party), they deem the district court's findings of fact to be highly probable, i.e., supported by clear and convincing evidence. See 286 Kan. at 705-06. When reviewing the evidence, we do not weigh conflicting evidence, pass on the credibility of witnesses, or redetermine factual questions. *In re Adoption of Baby Girl P.*, 291 Kan. 424, 430-31, 242 P.3d 1168 (2010).

14

Where, as here, the child is an Indian child, ICWA also applies. Before ordering termination of parental rights, ICWA requires proof beyond a reasonable doubt and supported by qualified expert testimony that the parent's continued custody is likely to result in serious emotional or physical damage to the child. See 25 U.S.C. § 1912(f) (2018); *In re L.M.B.*, 54 Kan. App. 2d 285, 297-98, 398 P.3d 207 (2017).

Kansas courts have adopted a two-step approach for termination of parental rights cases involving an Indian child: (1) first, applying the state law test for terminating parental rights set forth in K.S.A. 2020 Supp. 38-2269 and (2) second, applying ICWA standards. *In re H.A.M.*, 25 Kan. App. 2d 289, 295-96, 961 P.2d 716 (1998); see *In re L.M.B.*, 54 Kan. App. 2d at 297-98.

Mother conflates these two steps by improperly claiming the state law findings must be established beyond a reasonable doubt when ICWA is involved. This is not true. Each step in the analysis is distinct, and Kansas caselaw interpreting the interplay between the state and federal statues "does not require that the state law elements for termination be proved beyond a reasonable doubt." *In re H.A.M.*, 25 Kan. App. 2d at 296. Thus, the clear and convincing standard applies in the first step of the analysis (when applying state law) and the reasonable doubt standard applies in the second step (when applying ICWA).

*Termination of parental rights under Kansas law*

A parent has a constitutionally protected liberty interest in the relationship with that parent's child. See *Santosky v. Kramer*, 455 U.S. 745, 753, 758-59, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982); *In re B.D.-Y.*, 286 Kan. at 697-98. As mentioned above, when a child has been adjudicated as a child in need of care, a district court may terminate parental rights only upon findings of both present and foreseeable future unfitness. See K.S.A. 2020 Supp. 38-2269(a). Section (b) of that statute lists nine nonexclusive factors

that, if applicable, the court must consider in determining parental unfitness. See K.S.A. 2020 Supp. 38-2269(b). Section (c) lists four additional nonexclusive factors for the court to consider if the child is not in the parent's physical custody. See K.S.A. 2020 Supp. 38-2269(c). The existence of any one of the factors in section (b) or (c) "standing alone may, but does not necessarily, establish grounds for termination of parental rights." K.S.A. 2020 Supp. 38-2269(f).

Additionally, when the district court relies on multiple statutory factors in finding parental unfitness, we will affirm so long as clear and convincing evidence supports a finding of unfitness based on one of those factors. *In re M.H.*, 50 Kan. App. 2d 1162, 1170, 337 P.3d 711 (2014); *In re P.H.*, No. 121,869, 2020 WL 3481530, at *14 (Kan. App. 2020) (unpublished opinion), *rev. denied* 312 Kan. 892 (2020); see *In re G.A-S.*, No. 118,579, 2018 WL 2170077, at *3 (Kan. App. 2018) (unpublished opinion).

Mother generally attacks the district court's findings of unfitness. First, she contends these findings primarily depended on her failure to explain D.L.'s injuries. She argues this was improper because she had a pending criminal case involving D.L.'s injuries, so she was unable to testify on that topic while also maintaining her constitutional right against self-incrimination. Given the situation, she argues the district court should have looked only to the remaining evidence instead when making its fitness determination. Next, she argues the remaining evidence is insufficient to support the district court's findings of unfitness.

  1. *Implication of Mother's Fifth Amendment right under the United States Constitution*

Mother relies on an opinion in a criminal case, *State v. Brown*, 37 Kan. App. 2d 726, 157 P.3d 655 (2007), *aff'd* 286 Kan. 170, 182 P.3d 1205 (2008) (*Brown I*), in support of her position that the district court should have discounted her failure to explain

D.L.'s injuries. In *Brown I*, the defendant, who was charged with aggravated battery and abuse of a child, had been involved in CINC proceedings based on injuries that his child sustained. In the CINC case, the Kansas Department of Social and Rehabilitation Services (now DCF) had essentially required the parents to admit to the abuse as a condition of reintegration. See 37 Kan. App. 2d at 727, 729-30. The case plan specifically included a requirement that the parents "'admit how [the] injuries were sustained to [the] children.'" 37 Kan. App. 2d at 729. Under pressure to admit how the injuries were sustained and faced with losing his parental rights, the defendant confessed to the abuse on the date of the termination hearing, which prompted the criminal charges.

*Brown I* focused on the admissibility of the defendant's confession in his criminal case. The *Brown I* panel of this court ultimately affirmed the district court's suppression of the confession because, under the circumstances, it was not freely and voluntarily made and thus violated the Fifth Amendment to the United States Constitution. 37 Kan. App. 2d at 732. The Kansas Supreme Court agreed, holding that if a parent is compelled to admit to criminal acts or face the loss of parental rights, the incriminating statements will be excluded from evidence when that parent becomes a defendant in criminal proceedings. *State v. Brown*, 286 Kan. 170, 181, 182 P.3d 1205 (2008) (*Brown II*).

In reaching its conclusion, the Kansas Supreme Court looked to other states for guidance on the implication of a parent's Fifth Amendment right in child protection proceedings. It acknowledged the Nebraska Court of Appeals has observed:

> "'[A] very fine, although very important, distinction between terminating parental rights based specifically upon a refusal to waive protections against self-incrimination and terminating parental rights based upon a parent's failure to comply with an order to obtain meaningful therapy or rehabilitation, perhaps in part because a parent's failure to acknowledge past wrongdoing inhibits meaningful therapy. The latter is constitutionally permissible; the former is not.'" 286 Kan. at 180-81 (quoting *In re Interest of Clifford M. et al.*, 6 Neb. App. 754, 765, 577 N.W.2d 547 [1998]).

It also pointed out the Vermont Supreme Court has recognized the importance of requiring a parent to undergo therapy and counseling in child abuse cases and has held "if the parents' denial of abuse interferes with effective therapy, then the court 'may act on that finding to the parents' detriment without offending the Fifth Amendment privilege.'" 286 Kan. at 181 (quoting *In re J.A.*, 166 Vt. 625, 626, 699 A.2d 30 [1997]).

We find the distinction recognized by the Kansas Supreme Court in *Brown II* is appropriate for addressing the interplay in child protection proceedings between a parent's constitutional right against self-incrimination under the Fifth Amendment and that parent's constitutional right to decide the care, custody, and control of their own children under the Due Process Clause of the Fourteenth Amendment to the United States Constitution. See *Brown I*, 37 Kan. App. 2d at 731-32. To be clear, we, like the Kansas Supreme Court in *Brown II*, do not adopt an absolute rule that requiring an admission of abuse as a condition of reunification violates a parent's rights under the Fifth Amendment. 286 Kan. at 181. We simply hold that the Fifth Amendment does not prohibit court-ordered clinical or substance abuse evaluations, nor does it prohibit a court's reliance on a parent's failure to undergo such evaluations when terminating parental rights. See *In re J.C.*, No. 71,839, 1995 WL 18253674, at *3 (Kan. App. 1995) (unpublished opinion).

The right against self-incrimination protects a person from being compelled in any criminal case to be a witness against him or herself. A CINC case is a civil proceeding. K.S.A. 2020 Supp. 38-2201(a); *In re J.D.C.*, 35 Kan. App. 2d 908, 910, 136 P.3d 950 (2006), *aff'd* 284 Kan. 155, 159 P.3d 974 (2007). Thus, while the privilege may be raised in a CINC proceeding (to protect against incrimination in pending or future criminal proceedings), it only protects against self-incrimination in criminal prosecutions. *Brown II*, 286 Kan. at 172-73, 179. There is nothing incriminating about participating in a mental health evaluation and recommended individual therapy.

With that said, we do not find Mother faced a constitutional conflict. Her constitutional right not to testify at the hearing about how D.L. was injured, based on her pending criminal charges, does not shield her from complying with the district court's order that she undergo both a clinical assessment and substance abuse evaluation and follow those recommendations. See *In re L.O.*, No. 80,381, 1998 WL 36036510, at *3 (Kan. App. 1998) ("'[T]he risk of losing the children for failure to undergo meaningful therapy is neither a "threat" nor a "penalty" imposed by the State. It is simply a consequence of the reality that it is unsafe for children to be with parents who are abusive and violent.'"). And, as in *In re J.C.*, Mother is not claiming concern that statements she made during court-ordered treatment could be used against her in the pending criminal case because she did not undergo the court-ordered treatment. See 1995 WL 18253674, at *3.

Mother's case plan did not include a requirement that she admit how D.L. was injured, like the case plan did in *Brown I*. Instead, the case plan required her to undergo clinical and substance abuse assessments and follow the recommendations, which she failed to do. Nor was the district court's ruling premised on Mother's failure to admit to abusing her child. Rather, the court recognized that Mother's resistance to therapy and failure to comply with its orders barred reintegration. We do not find it inappropriate for the court to consider Mother's noncompliance in its decision to terminate her parental rights, including in its findings regarding her unfitness and E.L.'s best interests. See *In re J.C.*, 1995 WL 18253674, at *3.

2. *Sufficiency of evidence supporting unfitness findings*

Even without an explanation from Mother about what happened to D.L., we find there is clear and convincing evidence in the record which makes the district court's findings of unfitness highly probable. Dr. Weeks' testimony established the extent of D.L.'s injuries, and the district court was persuaded by her opinion that the injuries arose

19

from ongoing abuse. Indeed, Dr. Weeks testified the abuse was escalating since the injuries occurred at different times.

Mother admits she did not participate in the recommended individual therapy. She also failed a court-ordered drug test, refused to submit to other court-ordered drug tests, and refused to undergo a substance abuse evaluation. The record contains clear and convincing evidence that she also violated the court order to stay away from Father, who repeatedly failed drug tests, and she did not complete the ordered WASAC protective parenting class. Given the many violations of her case plan and the court's orders, a reasonable person could agree with the district court that E.L. would suffer the same abuse as D.L. if she were returned to Mother's custody.

Mother claims the district court failed to sufficiently consider her efforts to improve her situation and comply with the case plan. She is essentially asking us to reweigh the evidence, by discounting Humphrey's testimony and emphasizing her own testimony and that of Jimison, her juvenile case worker. Yet, the court weighed and judged the credibility of the testimony Mother and Jimison provided against the testimony from Humphrey and the State's other witnesses. We will not retread that ground. *In re B.D.-Y.*, 286 Kan. at 705. Instead, our job is to determine whether, after reviewing all the evidence in the light most favorable to the State, we are convinced that a rational fact-finder could have found the district court's determination to be "highly probable." 286 Kan. at 705-06. Given the evidence here, we are indeed convinced.

Mother asserts she "completed nearly every case plan task" and accuses SFM of failing to help her complete the remaining tasks, but the record reveals significant evidence to the contrary. While Mother claims she demonstrated "housing stability," the evidence shows she did not allow Faine into her home, she purposefully kept her whereabouts from Faine, and she only told Faine about her apartment and let Faine inspect it after the termination hearing began. And even then, Faine discovered

20

substantial evidence that Father was living there, despite the parents' no-contact order and Father's multiple failed drug tests. Likewise, Mother claims on appeal that she completed "multiple programs and therapy," but she admitted at the termination hearing she did not, in fact, complete therapy—she quit because she refused to talk about the very issue that brought her there: D.L.'s injuries. She also refused to obtain a substance abuse evaluation after she failed a drug test. And although Mother now claims she quit therapy because she could not afford it, Faine testified she told Mother about options for therapy where Mother would be charged on a sliding scale. Last, while Mother claims she "obtained and maintained employment," Faine testified Mother never provided SFM with verification of employment. Mother's claim of progress is simply not supported by the evidence presented in the district court, particularly when viewing the evidence in the light most favorable to the State.

Mother acknowledges that, when determining whether a parent's unfitness is "unlikely to change in the foreseeable future," a court may look to a parent's past conduct as an indication of the parent's future behavior. *In re M.S.*, 56 Kan. App. 2d 1247, 1264, 447 P.3d 994 (2019); see K.S.A. 2020 Supp. 38-2269(a). Courts are also to use "child time" when assessing the foreseeable future. 56 Kan. App. 2d at 1263. The foreseeable future is examined from the child's perspective because children have a different perception of time than adults and have a right to permanency within a time frame reasonable to them. *In re M.H.*, 50 Kan. App. 2d 1162, 1170-71, 337 P.3d 711 (2014). The KCCC, at K.S.A. 2020 Supp. 38-2201(b)(4), acknowledges that children experience the passage of time differently than adults, making a month or a year seem much longer than it would for an adult. *In re M.S.*, 56 Kan. App. 2d at 1263. This difference in perception points to a prompt and permanent disposition. 56 Kan. App. 2d at 1263. Additionally, when a child is very young and lacks any real relationship with the parent, as here, this court has suggested that this factor is particularly significant. See 56 Kan. App. 2d at 1264.

21

Mother argues she simply needs more time to show progress, claiming her case is like *In re S.T.*, No. 121,376, 2019 WL 6795836 (Kan. App. 2019) (unpublished opinion). But her case is nothing like *In re S.T.* There, the district court found the father unfit because of his incarceration and lack of communication with his child that resulted from his incarceration. 2019 WL 6795836, at *2. The district court then determined these bases of unfitness—incarceration and lack of communication with his child—were unlikely to change in the foreseeable future. Another panel of this court disagreed because the evidence showed the father was to be released from prison in six months, and his assigned social worker testified he could resume visits upon release and begin to work towards integration. That court found the district court erred in finding the conditions of unfitness—incarceration and the resulting lack of communication—would persist sufficiently long enough to support terminating his parental rights. 2019 WL 6795836, at *4.

Mother argues that, like the father in *In re S.T.*, she also should have been given more time to progress towards reintegration, citing the pending criminal case as a barrier since she was unable to testify about D.L.'s injuries. In essence, she is claiming she had a right to continue this case to allow her to resolve her criminal case first. She did not. In fact, other panels of this court have rejected this same argument because it fails to recognize the requirement to view these cases in "child time" and not "adult time" and ignores the child's need for stability. See *In re D.T.*, 30 Kan. App. 2d 1172, 1175, 56 P.3d 840 (2002); *In re G.H.*, No. 108,769, 2013 WL 4404261, at *3-4 (Kan. App. 2013) (unpublished opinion). Further, as discussed above, the pending criminal case is not the reason Mother failed to address D.L.'s injuries in therapy, nor does she argue she intended to participate in therapy after the criminal case is resolved. The pending criminal case is a red herring which the district court rightfully discounted.

We find clear and convincing evidence supports the district court's conclusion that Mother failed to provide a safe living environment for E.L. and that she failed to

meaningfully change the conduct or condition which led to E.L. being placed into protective custody. We do not find the court erred in terminating Mother's parental rights.

### 3. *District court's finding on E.L.'s best interests*

If a court makes a finding of unfitness, then it must determine whether termination of parental rights is "in the best interests of the child." K.S.A. 2020 Supp. 38-2269(g)(1). In making this determination, the court must "give primary consideration to the physical, mental and emotional health of the child." K.S.A. 2020 Supp. 38-2269(g)(1).

While a court's unfitness finding must be supported by clear and convincing evidence, the best-interests determination depends on a preponderance of the evidence. See *In re R.S.*, 50 Kan. App. 2d 1105, 1116, 336 P.3d 903 (2014). This is because the analysis of a parent's unfitness determines the constitutional question of whether a parent's rights *can* be terminated, and the analysis of the child's best interests determines whether a parent's rights *should* be terminated. 50 Kan. App. 2d at 1115-16. Further, the best-interests determination is reviewed for an abuse of discretion since, just like in child-custody decisions in divorce cases, the "'district court [is] in a better position to evaluate the complexities of the situation and to determine the best interests of the children.'" 50 Kan. App. 2d at 1114-15 (quoting *In re Marriage of Bradley*, 258 Kan. 39, 45, 899 P.2d 471 [1995]).

A district court abuses its discretion if no reasonable person would agree with the district court, or the court premised its decision on a factual or legal error. *In re R.S.*, 50 Kan. App. 2d at 1116. Mother does not argue the court made a factual or legal error. The only argument she makes that termination was not in E.L.'s best interests is E.L.'s young age—she claims this means E.L. has "many years of childhood remaining, during which Mother could continue to bond to her and be a significant part of her life." But just

because Mother *could* be a significant part of E.L.'s life does not mean her involvement would be in E.L.'s best interests.

Our review of the evidence does not reveal an abuse of discretion by the district court. Mother's argument about E.L.'s young age does not account for Mother's failure to comply with the district court orders designed to achieve reintegration and her substantiated physical abuse of D.L. (or her failure to prevent such abuse). Indeed, Dr. Weeks, Humphrey, and Faine all testified they were concerned about E.L being physically abused if she were returned to her parents.

Mother acknowledges we are to consider "the nature and strength of the relationships between children and parent and the trauma that may be caused to the children by termination, weighing these considerations against a further delay in permanency for the children." *In re K.R.*, 43 Kan. App. 2d 891, 904, 233 P.3d 746 (2010). Dr. Weeks and Humphrey noted E.L. is doing well in the foster home with her sibling, D.L. Further, E.L. was taken into custody as a newborn, four days after her birth—meaning E.L. has spent essentially no amount of time in Mother's custody throughout her life. Under these circumstances, we find a reasonable person could agree with the court's decision that termination was in E.L.'s best interests.

*Termination of parental rights under ICWA*

To terminate parental rights to an Indian child, ICWA requires: (1) under the Indian Child Welfare Act, 25 U.S.C. § 1912(f) (2018), "a determination, supported by evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child"; and (2) under 25 U.S.C. § 1912(d), the party seeking termination "shall satisfy the court that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of

24

the Indian family and that these efforts have proved unsuccessful." ICWA does not elaborate on these requirements. That said, there are now binding federal regulations for state courts to follow in Indian child-custody proceedings that interpret these ICWA requirements. See 81 Fed. Reg. 38,778 (June 14, 2016); see 25 C.F.R. §§ 23.101-144 (2016).

In 1979, the Department of the Interior, through the Bureau of Indian Affairs, (the Department) issued several rules implementing ICWA—which included various binding regulations codified at 25 C.F.R. § 23 (none of which are relevant here), as well as nonbinding, recommended guidelines for state courts to apply in Indian child-custody proceedings. See 44 Fed. Reg. 67,584 (1979) (guidelines); see also 81 Fed. Reg. 38,778, 38,785-86 (2016) (noting Department made clear in 1979 that guidelines addressing state-court Indian child-custody proceedings not intended to have binding effect). The Department published an updated version of those nonbinding guidelines in 2015. See 80 Fed. Reg. 10,146-02 (2015). But the Department has since recognized a need for binding standards for Indian child-custody proceedings in state courts, and on June 14, 2016, the Department issued a final rule that added a new subpart to 25 C.F.R. § 23 to address state court implementation of ICWA. See 81 Fed. Reg. 38,778, 38,779, 38,782-86 (2016); see 25 C.F.R. §§ 23.101-144. The final rule also updated certain definitions that 25 C.F.R. § 23 incorporates by reference, including—relevant here—the definition of "active efforts" at reunification. See 81 Fed. Reg. 38,778, 38,864-65 (2016); see 25 C.F.R. § 23.102 (providing terms not defined have meaning assigned in 25 C.F.R. § 23.2); see 25 C.F.R. § 23.2 (defining "active efforts"). While both parties rely on the 2015 version of the nonbinding guidelines in their briefs, we apply the binding federal regulations adopted in 2016.

Mother's only argument under ICWA is that there was not clear and convincing evidence supporting the district court's finding that the State made active efforts at reunification, as required by 25 U.S.C. § 1912(d). Mother asserts four arguments on this

issue: (1) SFM did not tailor her case plan to her needs, as it contained tasks she had completed before in other cases; (2) SFM did not tailor its efforts to Mother's young age and failed to educate her on the role and function of community resources that would have provided her with more guidance given her young age and inexperience; (3) SFM did not use active efforts to help Mother complete the tasks in her case plan—referring specifically to its failure to assist her with the task of attending individual therapy; and (4) active efforts were not made towards her visitation with E.L.

The 2016 federal regulations provide the following definition of "active efforts" and a nonexhaustive list of examples of what may constitute active efforts:

"Active efforts means affirmative, active, thorough, and timely efforts intended primarily to maintain or reunite an Indian child with his or her family. Where an agency is involved in the child-custody proceeding, active efforts must involve assisting the parent or parents or Indian custodian through the steps of a case plan and with accessing or developing the resources necessary to satisfy the case plan. To the maximum extent possible, active efforts should be provided in a manner consistent with the prevailing social and cultural conditions and way of life of the Indian child's Tribe and should be conducted in partnership with the Indian child and the Indian child's parents, extended family members, Indian custodians, and Tribe. Active efforts are to be tailored to the facts and circumstances of the case and may include, for example:

"(1) Conducting a comprehensive assessment of the circumstances of the Indian child's family, with a focus on safe reunification as the most desirable goal;

"(2) Identifying appropriate services and helping the parents to overcome barriers, including actively assisting the parents in obtaining such services;

"(3) Identifying, notifying, and inviting representatives of the Indian child's Tribe to participate in providing support and services to the Indian child's family and in family team meetings, permanency planning, and resolution of placement issues;

"(4) Conducting or causing to be conducted a diligent search for the Indian child's extended family members, and contacting and consulting with extended family members to provide family structure and support for the Indian child and the Indian child's parents;

26

"(5) Offering and employing all available and culturally appropriate family preservation strategies and facilitating the use of remedial and rehabilitative services provided by the child's Tribe;

"(6) Taking steps to keep siblings together whenever possible;

"(7) Supporting regular visits with parents or Indian custodians in the most natural setting possible as well as trial home visits of the Indian child during any period of removal, consistent with the need to ensure the health, safety, and welfare of the child;

"(8) Identifying community resources including housing, financial, transportation, mental health, substance abuse, and peer support services and actively assisting the Indian child's parents or, when appropriate, the child's family, in utilizing and accessing those resources;

"(9) Monitoring progress and participation in services;

"(10) Considering alternative ways to address the needs of the Indian child's parents and, where appropriate, the family, if the optimum services do not exist or are not available;

"(11) Providing post-reunification services and monitoring." 25 C.F.R. § 23.2.

Several statements in the preamble of the final rule mentioned above clarify the active efforts requirement. Relevant here, the Department stated:

"The final rule clarifies that, where an agency is involved in the child-custody proceeding, active efforts involve assisting the parent through the steps of a case plan, including accessing needed services and resources. This is consistent with congressional intent—by its plain and ordinary meaning, 'active' cannot be merely 'passive.'" 81 Fed. Reg. 38,778, 38,790 (2016).

The preamble also provided that the sufficiency of "active efforts" will vary case-by-case and the final rule's definition of active efforts retains a state court's discretion to consider the facts and circumstances of each case. 81 Fed. Reg. 38,778, 38,791 (2016). Lastly, the preamble noted that some commenters suggested requiring a minimum number of the listed examples to reach the active efforts threshold, but the Department

27

responded that "[t]he minimum actions required to meet the 'active efforts' threshold will depend on unique circumstances of the case." 81 Fed. Reg. 38,778, 38,791 (2016).

Neither ICWA nor its regulations provide the standard of proof required for the State to prove it made active efforts at reunification. In the preamble of the final rule, the Department explicitly declined to establish a uniform standard of proof. 81 Fed. Reg. 38,778, 38,816 (2016). Thus, we continue to use the same standard of proof Kansas has used to determine whether the State has met its burden, which requires the State prove, by clear and convincing evidence, that it used active efforts. See *In re L.M.B.*, 54 Kan. App. 2d at 303. Thus, we ask whether, after reviewing all the evidence in the light most favorable to the State, we are convinced that a rational fact-finder could have found the district court's determination to be highly probable. See 54 Kan. App. 2d at 304.

1. *SFM's case plan*

Mother first argues SFM failed to use active efforts at reunification because the SFM caseworkers did not tailor her case plan to her needs—specifically, she claims the case plan contained tasks she had completed before, in connection with D.L.'s CINC case and that case's corresponding criminal case. Yet, Mother fails to point to any specific case plan task which she claims was unnecessarily duplicative or even inappropriate for E.L.'s case. Indeed, the binding regulations do not require SFM to ensure that a parent's case plan does not include tasks the parent has already completed in other cases. Instead, the regulations only require that the agency's active efforts be "tailored to the facts and circumstances of the case." 25 C.F.R. § 23.2. And, as noted above, the district court may consider the facts and circumstances of each case to determine what constitutes active efforts at reunification. 81 Fed. Reg. 38,778, 38,791 (2016).

Mother does not explain the problem with asking her to complete "many" (her description) of the same tasks in E.L.'s case which she was ordered to complete in D.L.'s

28

case or her related criminal case, and the alleged problem is not self-evident. By failing to provide any factual or legal argument in support of this issue, she has abandoned it. *State v. Raskie*, 293 Kan. 906, 919, 269 P.3d 1268 (2012).

Further, in the testimony Mother cites on this point, the only tasks which she had to complete in both cases were drug tests and parenting classes. Again, Mother offers no reason why ordering her to complete these tasks in E.L.'s case (which was after D.L.'s case) was inappropriate. Indeed, Mother's failure to successfully complete these requirements and her positive drug test in E.L.'s case directly bear on her parental fitness. Further, the reports from hospital staff about Mother's inadequate care and resistance to instruction on how to care for E.L. justifies requiring parenting classes again in E.L.'s case.

Faine testified when she first went over the case plan, Mother told her she was unwilling to comply with the court-ordered tasks in E.L.'s case because she claimed she had already completed the court-ordered tasks in D.L.'s case. Rather than accept Mother's resistance, Faine continued to explain in their monthly meetings why Mother needed to complete the tasks in E.L.'s case. Faine also testified if Mother had successfully completed a task in D.L. 's case, she may not have to repeat it in E.L.'s case. For example, Faine testified she originally did not expect Mother to obtain another substance abuse evaluation, since she had obtained one in D.L.'s case. Faine only required Mother to obtain a substance abuse evaluation in E.L.'s case after Mother's positive hair follicle test.

The other tasks addressed in the testimony Mother cites were tasks which Faine credited Mother with completing, even though she did not have to do so in E.L.'s case. These other tasks included a domestic violence education class in 2018, an anger management class in 2019, and a consumer credit counseling service and financial management session in 2020, none of which were included in Mother's case plan. Rather than evidencing only "passive efforts" by SFM, the fact that SFM documented and

29

credited Mother with completing supportive tasks which were not ordered in E.L.'s case shows SFM was actively monitoring Mother's progress and participation in services, one of the examples of "active efforts" provided in 25 C.F.R. § 23.2(9). This comprehensive documentation shows SFM was taking a holistic view of Mother's progress and crediting her with taking positive steps, rather than limiting their monitoring to only E.L.'s case. We do not find some repetition of case plan tasks and documentation of case plan tasks completed in other cases as evidence that SFM failed to engage in the active efforts required by ICWA.

## 2. *Identification of appropriate services*

Mother next argues that SFM failed to use active efforts at reunification because she asserts SFM failed to educate her on the role and function of community resources that would have provided her with more guidance given her young age and inexperience. Once again, Mother provides no factual support for this argument, thus abandoning it. *Raskie*, 293 Kan. at 919.

One example of active efforts at reunification set forth in the ICWA regulations is "[i]dentifying appropriate services and helping the parents to overcome barriers, including actively assisting the parents in obtaining such services." 25 C.F.R. § 23.2(2). Yet, Mother does not explain how she believes SFM failed in this regard. The record shows when Mother claimed she could not afford therapy, SFM told her she could obtain it from a provider who charges on a sliding scale. When Mother missed several appointments for drug tests, Faine offered to take her. Humphrey, whom Mother admits was a "qualified expert witness" under ICWA, testified she was unaware of any additional services SFM could have offered the parents that might have helped them succeed. We find clear and convincing evidence in the record to support the district court's finding that SFM engaged in active efforts at reunification, including by satisfying this example from the ICWA regulations.

3. *Assistance with completion of case plan tasks*

Mother also baldly claims she "completed nearly every case plan task" and if she did not, then SFM did not use active efforts to assist her completion. This assertion falls under the example of active efforts just discussed. See 25 C.F.R. § 23.2(2). But the only instance Mother mentions is her cessation of individual therapy. And while she claims she quit therapy because she could no longer afford it, both Mother and Faine testified at the hearing Mother was resistant to therapy because she felt it unnecessary, and she quit going because she did not like the topics of discussion. Further, when Mother told SFM she could not afford it, SFM told her about sliding scale providers.

There is clear and convincing evidence in the record that not only did Mother never attend individual therapy in E.L.'s case, but she was resistant to doing so. Even so, Mother's resistance did not deter Faine from continuing to engage Mother about this case plan task. Faine discussed the therapist's recommendation after Mother's initial assessment in February 2020, but Mother declined to attend. Faine asked Mother again about therapy in April 2020, to which Mother responded that "she will not be engaging in therapy as she does not have time for that" and that "it will not help her as she has completed therapy before." Faine addressed therapy yet again with Mother in June 2020, at which time Mother told Faine: (1) She is not engaged in therapy; (2) she feels that she did not need therapy even though it was recommended from her clinical assessment; (3) all they do in therapy is accuse her of her son's injuries; (4) she feels that therapy does not work; and (5) she also does not have insurance and cannot pay $100 per session. Faine also tried to help Mother overcome her financial barrier by telling her about providers who would charge on a sliding scale.

Other courts have held a "parent's demonstrated lack of willingness to participate in services may be considered in determining whether the State's efforts were adequate" under ICWA. *Chloe O. v. State, Dep't of Health & Soc. Servs., Off. of Children's Servs.*,

31

309 P.3d 850, 857 (Alaska 2013); see *N.A. v. State*, 19 P.3d 597, 603-04 (Alaska 2001); *Matter of Maricopa County Juvenile Action No. JS-8287*, 171 Ariz. 104, 113, 828 P.2d 1245 (Ariz. Ct. App. 1991); *Matter of M.E.M.*, 209 Mont. 192, 197-98, 679 P.2d 1241 (1984); *State ex rel. Juvenile Dep't of Multnomah County v. Woodruff*, 108 Or. App. 352, 357, 816 P.2d 623 (1991). Likewise, we do not find Mother's reluctance to participate in individual therapy meant SFM did not engage in active efforts to persuade her to do so.

In *Chloe O.*, Chloe (the mother) completed a mental health assessment after she lost custody of her child, which called for her to participate in intensive one-on-one therapy. Chloe began participating in therapy, but she stopped after a few sessions. She then refused her social worker's offer to help her reengage. On appeal, Chloe claimed the State's efforts to get her to participate in mental health services were passive, not active. She argued Alaska's Office of Children's Services (OCS) should have obtained a court order requiring her to participate in mental health services. The Alaska Supreme Court disagreed, noting "it is not possible to force an unwilling client to participate in mental health treatment," and "'requiring OCS to seek court orders for every uncooperative parent would put a huge and pointless burden on the department and the court system.'" 309 P.3d at 857. Here, the court ordered Mother to obtain a clinical assessment and, if recommended, participate in individual therapy. But she still failed to comply. While Mother claims SFM passively accepted her refusal to participate, she fails to articulate what else SFM should or could have done.

The record shows SFM, through Faine, provided Mother with phone numbers to community agencies to complete her court orders, met with her regularly, discussed Mother's progress on obtaining individual therapy, stressed to Mother the importance of getting into individual therapy and informed her there were places that would only charge her on a sliding scale. Given this evidence, we find it highly probable that a reasonable fact-finder would agree with the district court that SFM engaged in active efforts at reunification, and, in particular, by satisfying this example from the ICWA regulations.

32

4. *Visitation with E.L.*

Mother's last argument that the State did not make active efforts at reunification involves her visitation with E.L. Another example of active efforts in the ICWA regulations is "[s]upporting regular visits with parents or Indian custodians in the most natural setting possible as well as trial home visits of the Indian child during any period of removal, consistent with the need to ensure the health, safety, and welfare of the child." 25 C.F.R. § 23.2(7). Mother argues the State did not make active efforts because in-person visitation stopped for a time, and only occurred once a month when it resumed. She also argues the virtual visits were not the most natural setting possible, and the foster parents hindered the visits.

Again, the visitation example is only one of several examples of active efforts listed in the ICWA regulations; it is not a requirement of ICWA. See 25 C.F.R. § 23.2. Even so, reviewing the evidence in the light most favorable to the State, as is required here, a rational fact-finder could have found it highly probable that SFM used active efforts in supporting Mother's visitation with E.L. While it is true the amount and type of visitation might be inadequate in a typical case, this was not a typical case. And, again, what constitutes "active efforts" depends on the facts and circumstances of each case.

We find SFM made active efforts to support regular visits with the parents. First, the limitations placed on visitation were outside of SFM's control. The Tribe is the one who limited visitation, first by initiating a travel ban during the COVID-19 pandemic and then by reducing transportation of E.L. to Wichita from four times a month to once a month, due to its staffing shortage. Yet, despite these limitations, SFM continued to support visitation by initiating weekly virtual visits with the parents. While no one claims virtual visits with a toddler are ideal, if SFM had not launched such visits, the parents would have had no contact with E.L. And each time the parents complained about

33

interference from the foster parents in the virtual visits, SFM stepped in and addressed their complaints.

SFM also regularly contacted the Tribe to inquire about the travel ban and attempt to restart in-person visitation. While Mother faults SFM at oral argument for not paying for her to travel to Oklahoma for visitation, the record reveals the Tribe offered to pay Mother's travel costs. The Tribe also offered to transport E.L. closer to Wichita, to minimize Mother's travel time. Since Mother did not accept either of these offers from the Tribe, she provides us no reason to believe she would accept them from SFM.

Mother next argues her level of visitation was unreasonable based on DCF policies and procedures. She references various policies which acknowledge the parents' right of reasonable contact with their children who are in out of home placement, emphasize the importance of such contact, and suggest that such contact should occur at least once a week "in naturally occurring settings." Still, as Mother rightly admits, the manual she references contains an exception to the visitation requirements when safety issues threaten the participants. See Kansas Department for Children and Families, Policy and Procedure Manual § 3237(G) (2021). While Mother claims "courts" may limit parental contact with the child, the exception is not so limited. Here, the COVID-19 pandemic presented a safety issue that threatened participants and, thus, justified a departure from DCF's general visitation standards. Further, by starting virtual visits, SFM ensured the parents continued to have weekly contact with E.L. Neither the Tribe nor SFM prohibited the parents from traveling to Oklahoma to continue weekly, in-person visits—indeed, the Tribe even tried to facilitate those by offering to pay the parents' travel costs and transport E.L. closer to Wichita. We do not find SFM violated DCF's policies or failed to engage in active efforts to support visitation.

Mother argues she should have been given more "expansive" visitation since she was in contact with SFM and acted appropriately during her visitation. Yet, Mother fails

34

to acknowledge how her behavior outside the visits prohibited such expansion. Mother refused to allow SFM to visit her home or even tell SFM her whereabouts in the weeks before the termination hearing, which Faine testified prevented the scheduling of in-person visits with Mother at her home. Mother also tested positive for methamphetamine, refused to obtain a substance abuse evaluation after the positive test, and continued to have contact with Father, who tested positive for methamphetamine several times.

Mother focuses on ways that she claims SFM failed to help her (despite her poor engagement) while ignoring other ways SFM actively strove towards reunification, including taking steps to keep siblings together, by placing E.L. in the same foster home as D.L. (an example of active efforts found in 25 C.F.R. § 23.2[6]) and by identifying community resources (which include mental health and substance abuse services) and actively helping Mother utilize and access those resources (an example of active efforts found in 25 C.F.R. § 23.2[8]). Viewing the evidence in the light most favorable to the State, a rational fact-finder could have found it highly probable that SFM made active but unsuccessful efforts to prevent a family breakup. In sum, each of Mother's arguments that the district court erred by finding SFM engaged in active efforts to reunite her with E.L. fails.

*Admissibility of Dr. Weeks' testimony*

Dr. Weeks provided expert testimony at the termination hearing about D.L.'s injuries and her opinion on the cause of those injuries. Mother claims the State had to disclose Dr. Weeks in accordance with the expert witness disclosure requirements set forth in K.S.A. 2020 Supp. 60-226(b)(6). Since it did not, she argues the district court should have exercised its discretion under K.S.A. 2020 Supp. 60-237(c) to prohibit Dr. Weeks' testimony at the hearing. We generally review a district court's decision to admit or exclude expert testimony for an abuse of discretion. See *Miller v. Johnson*, 295 Kan. 636, 687-88, 289 P.3d 1098 (2012), *overruled on other grounds by Hilburn v. Enerpipe*

*Ltd.*, 309 Kan. 1127, 442 P.3d 509 (2019). That said, when a district court's admission of expert testimony turns on statutory interpretation, this court's review is de novo. See *Bullock v. BNSF Railway Co.*, 306 Kan. 916, 921, 399 P.3d 148 (2017).

The KCCC sets forth the procedures for CINC matters. See K.S.A. 2020 Supp. 38-2203(a). While Mother acknowledges the KCCC includes a statute which governs discovery in such matters, she misconstrues it. See K.S.A. 2020 Supp. 38-2245. The civil discovery procedures Mother relies on here only apply (1) after a hearing, and (2) after a finding that the Chapter 60 civil discovery procedures will expedite the proceedings. K.S.A. 2020 Supp. 38-2245(a). This likely stems from one of the stated policies of the KCCC—to dispose of all proceedings without unnecessary delay. See K.S.A. 2020 Supp. 38-2201(b)(4). There was no such hearing or finding in this case, nor does the record reflect that Mother requested one. Moreover, a panel of this court has described a judge's decision to apply the civil discovery procedures in this context as "a matter of discretion." *In re K.W.C.*, No. 112,904, 2015 WL 6112013, at *8 (Kan. App. 2015) (unpublished opinion).

Additionally, the KCCC only requires a party to disclose the names of its potential witnesses "upon request." See K.S.A. 2020 Supp. 38-2245(b). Mother does not assert that she requested such disclosure, and no such request appears in the record on appeal.

Mother asserted no other basis, either to the district court or to us, that the admission of Dr. Weeks' testimony was improper. As a general rule, unless there are exceptional circumstances, appellate courts do not consider issues on appeal that were not raised by the parties. *State v. Adams*, 283 Kan. 365, 367, 153 P.3d 512 (2007). Further, "failure to brief and argue an issue constitutes a concession of an issue by the parties." *State v. Laborde*, 303 Kan. 1, 7-8, 360 P.3d 1080 (2015), *overruled on other grounds by Balbirnie v. State*, 311 Kan. 893, 468 P.3d 334 [2020]); see *State v. Godfrey*, 301 Kan. 1041, 1043-44, 350 P.3d 1068 (2015).

Since Mother has failed to establish the discovery procedures requiring expert witness disclosure applied here, the court did not abuse its discretion in denying the parents' motion to exclude Dr. Weeks' testimony.

Affirmed.