NOT DESIGNATED FOR PUBLICATION

Nos. 123,995
123,996

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interests of K.G. and R.G.,
Minor Children.

MEMORANDUM OPINION

Appeal from Butler District Court; JOE E. LEE, magistrate judge. Opinion filed March 18, 2022.
Affirmed.

*Joshua S. Andrews*, of Cami R. Baker & Associates, P.A., of Augusta, for appellant.

*Cheryl M. Pierce*, assistant county attorney, for appellee.

Before ARNOLD-BURGER, C.J., POWELL and SCHROEDER, JJ.

ARNOLD-BURGER, C.J.: The natural father (Father) of K.G. (born in 2015) and R.G. (born in 2010) (the children) appeals the district court's termination of his parental rights. Father argues the district court's finding of unfitness was not supported by clear and convincing evidence. Father also argues the district court abused its discretion in finding that terminating his parental rights was in the best interests of the children. After a careful review of the record, we find no error and affirm.

FACTS

In December 2018, Father was pulled over in a traffic stop. A Butler County sheriff's deputy determined Father was driving with a suspended license and had an

1

active warrant for his arrest. K.G., who was three years old at the time, was in the backseat of the vehicle. Father was arrested at the scene, and the sheriff's deputy searched the vehicle incident to arrest. During the search, the deputy found a gun under the front seat of the car—even though Father admitted he was not allowed to possess a gun because he was a convicted felon—and blotter paper, often used for LSD. Father admitted he had methamphetamine on him and had been using methamphetamine daily since the summer of 2017. In fact, Father admitted (1) he snorted methamphetamine just before K.G.'s natural mother (Mother) dropped K.G. off with Father; (2) he distributed methamphetamine to friends out of his home; and (3) he had a gallon bag of marijuana in his home. K.G. was taken into protective custody.

At the time of the stop, Father was on probation in another case involving theft from Mother. One of the conditions of probation was that Father was allowed only supervised visitation with K.G. and his sister, R.G.—mirroring a protection from abuse order that had been entered against him at the request of Mother. There was a history of domestic violence in the home to which the children had been exposed. Contrary to the order and the terms of Father's probation, K.G. and R.G. were staying for extended periods of time with Father. A hair follicle was collected from K.G. three days after the stop. Testing revealed that K.G. was positive for methamphetamine. R.G. was also taken into protective custody.

The district court entered an ex parte order of protective custody and, as part of that order, Father was ordered to have no contact with the children. As a result of the evidence obtained following the traffic stop, Father was subsequently convicted of aggravated endangering of a child—K.G.—and possession with intent to distribute methamphetamine.

The State filed two separate petitions to adjudicate K.G. and R.G. as children in need of care (CINC). The State also requested the district court issue a child support

2

order for both children. The district court appointed a guardian ad litem (GAL) for K.G. and R.G.

In February 2019, Mother and the children's GAL stipulated to the State's allegations. Father did not appear because he was incarcerated and had been since his arrest in December 2018. The district court adjudicated the children to be in need of care and approved and adopted the State's proposed permanency plan. The children remained in the custody of the Kansas Department for Children and Families with out-of-home placement. The district court further ordered the children have no contact with Father.

In September 2019, while Father was still incarcerated, he requested the district court lift the no-contact order with his children. Father's request was denied, and the district court further ordered Father to complete as many case plan tasks as possible while in prison. In October 2019, the district court allowed Father to contact the children by letter if the children's therapist recommended such contact. Subsequently, Father had no contact with R.G. and limited contact with K.G.

In June 2020, the State filed a motion for a finding of unfitness and termination of parental rights or appointment of a permanent custodian for the children. The State alleged Mother and Father were unfit by reason of conduct or condition rendering them unable to properly care for the children, and such circumstances were unlikely to change in the foreseeable future. The State also alleged there was a presumption of unfitness because the children had been in out-of-home placement for a cumulative total period of 16 months. Father requested and received a continuance until after his release from prison in January 2021.

Shortly after Father's release from prison, he completed an alcohol and drug assessment, provided a negative drug test, and completed a parenting class. Meanwhile, K.G.'s therapist submitted her report, noting that K.G. demonstrated symptoms of

significant trauma but was making progress. She observed that when K.G. had contact with his Father by phone, it seemed to cause him to regress into the trauma of the past. K.G.'s therapist recommended continued individual therapy and termination of parental rights. She noted that K.G. had shared his exposure to significant domestic violence and trauma and strongly recommended K.G. not be returned to either parent's custody as it would be detrimental to K.G.'s mental health.

Prior to the hearing, R.G. wrote a letter to the district court, in essence begging not to be returned to Father's custody. She indicated that she felt for a long time that it was her duty to take care of K.G. because neither of her parents was doing so. At a mere eight years old, R.G. had to make K.G. food, put him to sleep, and watch him and play with him throughout the day. R.G. had not talked to her Father for two years and did not want to. When she encountered him unexpectedly in court one day, she became sick and felt unsafe. She expressed gratitude that she was in a home where she could feel like a kid again and not have to worry about grown-up things.

The termination hearing was held three weeks after Father's release from prison. After considering all the evidence, including evidence presented by the State and Father at the termination hearing, the district court found Father was unfit, was unlikely to become fit in the foreseeable future, and termination of his parental rights was in the best interests of the children. The district court held that Father was incarcerated for a reason and it was his own conduct that put him in prison. Father had at least five convictions for driving under the influence and three felony convictions for possession with intent to sell or sale of drugs, as well as a conviction for aggravated endangering a child related to K.G. The district court further noted that even though Father had signed a lease for an apartment, he had not yet moved into the apartment and had failed to establish a residence. Father also provided a year-old paycheck from his work release to establish he had obtained employment.

In a separate hearing, Mother relinquished her parental rights and does not participate in this appeal.

ANALYSIS

I.     THE LAW REGARDING TERMINATION OF PARENTAL RIGHTS IS WELL-SETTLED.

A parent has a constitutionally recognized fundamental right to a parental relationship with his or her child. See *Santosky v. Kramer*, 455 U.S. 745, 753, 758-59, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982); *In re B.D.-Y.*, 286 Kan. 686, 697-98, 187 P.3d 594 (2008). Accordingly, parental rights for a child may be terminated only upon clear and convincing proof of parental unfitness. K.S.A. 2020 Supp. 38-2269(a); *Santosky*, 455 U.S. at 769-70; *In re R.S.*, 50 Kan. App. 2d 1105, 1113, 336 P.3d 903 (2014).

A district court may terminate parental rights only after a child has been found to be a child in need of care and the court finds by clear and convincing evidence that:

- the parent is unfit and unable to care properly for a child;
- the conduct or condition that renders the parent unfit is unlikely to change in the foreseeable future; and
- by a preponderance of evidence, it is in the best interests of the child to terminate parental rights. See K.S.A. 2020 Supp. 38-2269(a) and (g)(1).

A.    *Determining unfitness*

Our statutes provide a list of nine nonexclusive factors the district court may rely on to determine if a parent is unfit. See K.S.A. 2020 Supp. 38-2269(b). Any one of those factors alone may be grounds to terminate parental rights. K.S.A. 2020 Supp. 38-2269(f).

5

When the child is not in the parents' physical custody—such as the case here—the district court must also consider four additional factors listed in K.S.A. 2020 Supp. 38-2269(c).

B.    *The foreseeable future*

When determining whether a parent's conduct is likely to change in the foreseeable future, the court considers the foreseeable future from the child's perspective because children experience time differently than adults. K.S.A. 2020 Supp. 38-2201(b)(4), *In re R.S.*, 50 Kan. App. 2d at 1117.

C.    *The best interests of the child*

In deciding whether termination of parental rights is in the best interests of the child, the court must give primary consideration to the physical, mental, and emotional needs of the child. K.S.A. 2020 Supp. 38-2269(g)(1). The child's best interests finding must be supported by a preponderance of evidence and is reviewed for an abuse of discretion. *In re R.S.*, 50 Kan. App. 2d 1115-16.

D.    *The presumption of unfitness*

Kansas statutes allow a court to presume a parent is unfit if it is established by clear and convincing evidence that the child has been placed outside the child's home "under court order for a cumulative total period of one year or longer and the parent has substantially neglected or willfully refused to carry out a reasonable plan, approved by the court, directed toward reintegration of the child into the parental home." K.S.A. 2020 Supp. 38-2271(a)(5). Once the presumption is established, the burden shifts to the parent to rebut the presumption by a preponderance of the evidence. Failure to prove that the parent is presently fit and able to care for the child now or will be fit in the foreseeable future mandates the termination of parental rights. K.S.A. 2020 Supp. 38-2271(b).

6

E.    *Our standard of review*

In reviewing a district court's termination of parental rights, we view all evidence in the light most favorable to the prevailing party to determine whether a rational fact-finder could have found it highly probable by clear and convincing evidence that parental rights should be terminated. *In re K.W.*, 45 Kan. App. 2d 353, 354, 246 P.3d 1021 (2011). In making this determination, we do not "weigh conflicting evidence, pass on credibility of witnesses, or redetermine questions of fact." *In re B.D.-Y.*, 286 Kan. at 705.

II.    CLEAR AND CONVINCING EVIDENCE SUPPORTS THE DISTRICT COURT'S FINDINGS THAT FATHER WAS UNFIT AND HIS CONDITION WAS UNLIKELY TO CHANGE IN THE FORESEEABLE FUTURE.

Father argues the factors the district court relied on to find him unfit and that his conduct or condition was unlikely to change in the foreseeable future were not supported by clear and convincing evidence.

A.    *The presumption of unfitness applies and the burden shifts to Father*.

We begin by noting that the district court found that the presumption of unfitness applied in this case because the children had been in an out-of-home placement for more than a year and Father had substantially neglected or willfully refused to carry out a reasonable plan directed toward reintegration. Father concedes that the children have been in out-of-home placements for over a year, but he disputes that there was clear and convincing evidence that he neglected or refused to carry out a reasonable plan of reintegration. He rests his argument on the proposition that he did not neglect his responsibilities but was prevented from carrying out a reasonable plan of reintegration due to his incarceration.

7

Although we agree that the mere fact of incarceration, standing alone, could be either a mitigating or an aggravating factor in determining whether a parent has appropriately pursued reintegration, we find that here the district court based its application of the presumption upon clear and convincing evidence. We find at least two factors support the district court's finding.

First, it is significant that Father was in prison for the criminal harm he inflicted upon K.G. Although incarceration for a reason that does not directly relate to the health and safety of his children could be a mitigating factor—for example, incarceration for a crime that was committed before the child was born—and could be unrelated to a parent's ability to care for his or her child. But like the district court, we find it hard to declare Father's incarceration a mitigating factor when the actions that resulted in Father's incarceration caused direct harm to the safety and well-being of K.G. As the district court stated, "[Father] was in prison for a reason[,] and it was his conduct that put him there."

Second, Father was unable to have contact with his children due to his behavior. Due to his threat to their safety and well-being, the district court ordered the children into protective custody and ordered that Father have no further contact with them. He had traumatized R.G. to the point that she wanted no further contact and felt unsafe around him. Likewise, although the district court did allow Father limited contact with K.G., the therapist made clear that even limited contact with K.G. was distressing to him and caused him to regress. So, there was clear and convincing evidence that the lack of meaningful contact and visitation with his children was not a failure on the part of the reintegration team; it was a failure on the part of Father.

Third, the fact that Father had been drug free for 25 months was, as the district court found, of little import because he had been incarcerated or under direct supervision that entire time. The district court weighed this in light of Father's history of the use and

sale of illegal drugs, alcohol abuse, and the fact that K.G. tested positive for methamphetamine, indicating exposure either directly or indirectly.

Having found that application of the presumption was supported by clear and convincing evidence, the burden shifts to Father to show by a preponderance of the evidence he is presently fit and able to care for the children now or will be fit in the foreseeable future. He clearly fails to do so.

B.      *Lack of evidence from Father related to his fitness now and in the foreseeable future*

Even though the district court applied the statutory presumption of unfitness, it also considered several statutory factors. After noting the presumption, the district judge opined that he did not think his "decision would be any different if the presumption wasn't there."

1.      *Use of intoxicating liquors or narcotic or dangerous drugs*

The district court found Father unfit under K.S.A. 2020 Supp. 38-2269(b)(3) for his history of using methamphetamine, rendering him unable to care for the ongoing physical, mental, or emotional needs of his children. Father argues that at the time of the termination hearing, he had been clean for 25 months, had completed two drug and alcohol treatment courses, and no further treatment was recommended. But the State pointed out Father had a long history of convictions for substance abuse crimes, including five convictions for driving under the influence and three convictions for possession with intent to sell or sale of drugs. In fact, Father was convicted in 2018 of aggravated endangering of a child as well as possession with intent to distribute—all related to an incident in which K.G. was present.

While Father remained clean for over two years, he was under some form of supervision throughout that period. "A district court may look to a parent's past conduct as an indicator of future behavior. [Citations omitted.]" *In re K.L.B.*, 56 Kan. App. 2d 429, 447, 431 P.3d 883 (2018). The district court here did just that, explaining, "There's been clear testimony in regard to the use of intoxicating liquor or narcotics, and dangerous drugs, that was leading up and added to why the children were taken in the first place."

While father did complete some inpatient programs while incarcerated, the time needed to ensure that he would be able to continue his sobriety into the foreseeable future was longer than would be reasonable given the time the children have been in out of home placement and the needs of the children for permanence and stability now.

Even when ignoring the presumption of unfitness and reviewing the district court's termination of parental rights in the light most favorable to the State, a rational fact-finder could have found Father's circumstances were unlikely to change in the foreseeable future. Clear and convincing evidence showed Father's unfitness related to this factor.

2. *Reasonable efforts by appropriate agencies*

Father challenges the district court's finding of unfitness under K.S.A. 2020 Supp. 38-2269(b)(7)—failure of reasonable efforts by appropriate public or private agencies to work toward reintegration of the children. Father argues there was no evidence TFI made any efforts to reintegrate him with his children. Father admits he was incarcerated until three weeks before the termination hearing but suggests he was willing to work toward a plan for reintegration to the extent possible from prison.

"'The purpose of the reasonable efforts requirement is to provide a parent the opportunity to succeed, but to do so the parent must exert some effort.' [Citation

omitted.]" *In re M.S.*, 56 Kan. App. 2d 1247, 1257, 447 P.3d 994 (2019). Here, TFI provided opportunities for Father to succeed. The TFI permanency supervisor overseeing Father's case testified Father had a willingness and desire to visit his children but was unable to do so due to a no-contact order for a large part of the case and because of his incarceration. This was not due to a lack of reasonable effort on the part of TFI. While TFI provided Father with minimal case plan tasks, it still provided reasonable efforts to work toward reintegration of the children to the extent possible. Father's status as a prison inmate complicated and inhibited the agency's ability to add certain tasks to Father's case plan. It does not appear unreasonable that new tasks were not immediately added to Father's case plan within the three weeks between his release from prison and the termination hearing. Even when ignoring the presumption of unfitness and reviewing the evidence in the light most favorable to the State, there is clear and convincing evidence TFI provided reasonable efforts to work toward reintegration and those efforts were not successful.

### 3.  *Lack of effort to adjust circumstances and carry out a reasonable reintegration plan*

The district court found Father unfit under K.S.A. 2020 Supp. 38-2269(b)(8)—for lack of effort to adjust his circumstances, conduct, or condition to meet the needs of the children—and under K.S.A. 2020 Supp. 38-2269(c)(3)—for failure to carry out a reasonable plan approved by the district court directed toward reintegration into the parental home. Father argues the testimony at the termination hearing "was replete with efforts by Father to adjust his circumstances to meet the needs of the minor children." Father points out he completed two drug and alcohol treatment programs in prison, completed a parenting class, and obtained a mental health evaluation after his release, and claimed he secured gainful employment and appropriate housing. Father also argues that TFI only assigned two tasks on his case plan: (1) to maintain contact with TFI and (2) to complete age-appropriate parenting classes—both of which Father completed.

11

The State, on the other hand, highlights Father's criminal history. The State responds to Father's arguments, suggesting Father's long history of continued drug use—evidenced by his five DUI convictions and three felony convictions for possession with intent to sell or sale of drugs—reveals a past lack of effort to adjust his circumstances to meet the children's needs. The State explains Father was incarcerated for his own conduct and the district court did not have to treat Father's incarceration as a mitigating factor. See *In re K.L.B.*, 56 Kan. App. 2d at 447. The district court noted Father "accomplished some things [in prison] that sometimes we, frankly, never see get done in regards to parenting class and so forth." But the district court clearly considered testimony from one of Father's permanency supervisors who explained TFI typically cannot work a case plan with an incarcerated parent. Accordingly, Father was assigned few case plan tasks.

Another of Father's permanency supervisors explained case plan tasks generally included drug testing, substance abuse treatment, and finding appropriate housing. TFI admitted it received a copy of Father's lease agreement for his apartment but had not yet had an opportunity to inspect the apartment. The district court ultimately determined Father had failed to establish a residence—a question of fact we do not reweigh. See *In re B.D.-Y.*, 286 Kan. at 705.

The district court overall considered Father's past circumstances as a negative factor in finding his parental unfitness. The district court properly acknowledged Father's efforts in the overall context of the facts but determined they were insufficient and showed a lack of effort to adjust his circumstances. Even when ignoring the presumption of unfitness and reviewing the evidence in the light most favorable to the State, there is clear and convincing evidence supporting the district court's finding.

### 4. *Maintaining regular visitation*

The district court found Father unfit under K.S.A. 2020 Supp. 38-2269(c)(2) for failure to maintain regular visitation, contact, or communication with the children or with the custodian of the children. Father contends he was actively engaged with TFI, even while he was in custody, and tried to arrange visitation with his children. Father maintained regular contact with K.G. after October 2019 by telephone but does not make a similar argument with respect to R.G.

The State asserts, under K.S.A. 2020 Supp. 38-2269(c), the district court could disregard incidental visitations, contacts, communications, or contributions with the children. The State argues Father had minimal contacts with K.G. by phone because TFI determined it was inappropriate for a then four-year-old child to visit Father in the work-release program. R.G. specifically expressed she did not want to visit Father. R.G. even wrote a letter to the district court stating she did not feel safe around her father and wanted to stay in her out-of-home placement. We pause to note that the district judge did state that he was not putting "as much weight on [R.G.'s] letter" in actually making the decision to terminate Father's parental rights to her. But the district judge made it clear he was doing so because that was solely his decision to make, not R.G.'s, and "[i]t shouldn't fall on [her] shoulders, ever."

Again, we do not reweigh evidence or redetermine questions of fact. *In re B.D.-Y.*, 286 Kan. at 705. The district court apparently disregarded Father's incidental visitations, contacts, communications, and contributions with the children, as permitted by statute. See K.S.A. 2020 Supp. 38-2269(c). Father's incarceration inhibited his ability to visit or contact the children, and R.G. did not wish to communicate with Father. The district court explained Father created the circumstances surrounding his incarceration, which hindered his ability to regularly contact the children. Father's contact and communication with the children were incidental during his incarceration.

13

Even when ignoring the presumption of unfitness and reviewing the evidence in the light most favorable to the State, there is clear and convincing evidence supporting the district court's finding of Father's parental unfitness on this factor.

5. *Paying a reasonable portion of substitute physical care and maintenance*

The district court also considered K.S.A. 2020 Supp. 38-2269(c)(4)—failure to pay a reasonable portion of the cost of substitute physical care and maintenance based on ability to pay—in finding Father unfit. Father contends his failure to pay child support was based on his inability to pay because of his incarceration. The State points out Father was in a work-release program and even provided an old paystub to establish employment but did not pay any child support while on work release.

The district court reiterated its point Father was in prison because of his own choices. Father was briefly in a work-release program for a portion of the two years he was incarcerated before he was sent to a prison facility due to Covid. Father provided a paystub showing, in April 2020, his year-to-date income was over $5,000. But the record on appeal does not include an order for child support.

A panel of this court explained this factor may still be found even when the district court never ordered the parent to pay child support. *In re M.H.*, No. 122,919, 2020 WL 7414467, at *9 (Kan. App. 2020) (unpublished opinion). At least during the portion of time Father was earning money on work release, he could have helped with providing for the financial needs of his children and paid some portion of substitute physical care and maintenance; he did not. Thus, even when ignoring the presumption of unfitness and reviewing the evidence in the light most favorable to the State, the district court's finding that Father failed to pay a reasonable portion of the cost of substitute physical care and

maintenance for his children based on his ability to pay is supported by clear and convincing evidence.

In sum, on each of these factors there was a lack of any evidence—let alone a preponderance of the evidence—that Father is presently fit and able to care for his children now or in the foreseeable future. One of Father's permanency supervisors testified reintegration would take at least six more months. By the time of the termination hearing in January 2021, the children had been in out-of-home placement for two years. K.G. was five years old at the time of the hearing and had been in out-of-home placement for about 40 percent of his life. The children would need significant therapy to deal with the trauma, and months maybe even years to try to re-establish a healthy relationship. Father showed no understanding of this need—further indicating that he is not fit now or in the foreseeable future to care for his children. See *In re R.S.*, 50 Kan. App. 2d at 1117 (holding that court considers foreseeable future from child's perspective because children experience time differently than adults.)

III.    THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN HOLDING THAT TERMINATION OF FATHER'S PARENTAL RIGHTS WAS IN THE BEST INTERESTS OF HIS CHILDREN.

Father claims the district court abused its discretion in finding the termination of his parental rights was in the best interests of the children. The State explains, by the time of the termination hearing, the children had been in custody for two years and it would take months and likely more than a year before reintegration with Father could possibly occur. The State argues it was in the best interests of the children to have stability and a permanent home now and argues the district court appropriately terminated Father's parental rights.

"A district court abuses its discretion if no reasonable person would agree with the district court, or the court premised its decision on a factual or legal error." *In re E.L.*, 61 Kan. App. 2d 311, 330, 502 P.3d 1049 (2021). The party asserting the district court abused its discretion bears the burden of showing such abuse of discretion. *Northern Natural Gas Co. v. ONEOK Field Services Co.*, 296 Kan. 906, 935, 296 P.3d 1106 (2013).

Here, Father does not argue the district court made a factual or legal error. The only argument he makes is that termination was not in the best interests of the children. He asserts that it is in their best interests to have him in their lives, particularly now that he has addressed his addiction issues. He noted that his most recent drug and alcohol evaluation indicated he did not need any further treatment. He also believes it is in K.G.'s best interests that Father be in K.G.'s life because Father was engaging in regular phone contact with K.G. We are not persuaded.

Based on the letter from K.G.'s therapist, R.G.'s letter, and the testimony from Father's case managers, the mental and emotional health of the children were improving in their current out-of-home placement. R.G. panics and cries at the thought of having to see Father, let alone live with him, due to trauma R.G. experienced while in his care. And K.G.'s therapist said it would be detrimental to K.G. to have any visitation with Father. At the termination hearing, the only evidence that Father was able to remain clean and sober was three weeks of sobriety following two years of incarceration.

Viewing the evidence in the light most favorable to the State, a rational fact-finder could reasonably find it was in the best interests of the children to terminate Father's parental rights and allow them to remain in out-of-home placement where they are thriving. We find the district court properly considered the physical, mental, and emotional needs of the children in finding it was in the children's best interests to terminate Father's parental rights.

16

Affirmed.