NOT DESIGNATED FOR PUBLICATION

No. 126,508

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interest of L.S.,
a Minor Child.

MEMORANDUM OPINION

Appeal from Shawnee District Court; PENNY R. MOYLAN, judge. Submitted without oral argument. Opinion filed May 24, 2024. Affirmed.

*Jennifer Martin Smith*, of Alderson, Alderson, Conklin, Crow & Slinkard, L.L.C., of Topeka, for appellant.

*Morgan L. Hall*, senior deputy district attorney, and *Michael F. Kagay*, district attorney, for appellee.

Before ARNOLD-BURGER, C.J., CLINE and COBLE, JJ.

PER CURIAM: In 2023, the Shawnee County District court terminated the parental rights of M.S. (Father) to L.S. Father brings this appeal. After review, we affirm the district court's termination of Father's parental rights.

FACTUAL AND PROCEDURAL HISTORY

On May 28, 2020, the State filed a petition alleging L.S. to be a child in need of care (CINC). That same day, the district court removed L.S. from Mother's care. Mother is not a party to this appeal, but for context, the removal order outlined that Mother was mentally and emotionally unstable; did not have a stable residence; had a history of drug use; a history of domestic violence between her and Father existed; that she was offered

1

services, but would not follow through with appointments; and there were previous agency involvements and concerns regarding Mother's ability to provide care for L.S. and her other children. Father was listed as living in Oklahoma.

L.S. was placed in the temporary custody of the Kansas Department for Children and Families (DCF). When Father returned to Kansas, KVC requested a hair follicle test from him. It was positive for methamphetamine.

Father subsequently acquiesced in L.S.' adjudication as a CINC. The district court ordered Father to complete a new hair follicle test and to have two consecutive clean urinalysis (UA) tests, one week apart from each other, before Father was permitted visits with L.S. Father did not comply with these requirements, and this interaction with DCF was his last for almost two years.

From December 2020 through December 2021, Father was arrested five times on charges related to the possession or distribution of methamphetamine, heroin, and drug paraphernalia. He was also arrested on warrants stemming from his noncompliance with his criminal cases.

Almost two years after L.S. was placed in DCF custody, the State filed a motion seeking to terminate Father's parental rights for unfitness. That same month, Father entered a global plea agreement in his various criminal cases, which resulted in felony convictions for possession of methamphetamine, possession of heroin, and distribution or possession with intent to distribute. These convictions resulted in Father being sentenced to over eleven years in prison. However, he was released on probation for a term of 36 months.

A summary of the evidence presented at Father's termination hearing follows.

1. L.S. was placed into DCF custody based on concerns that Mother was a victim of human trafficking, Mother had serious mental health and substance abuse issues, and there were allegations of domestic violence between Mother and Father.

2. Father was assigned the following case plan tasks, with the following results:

    a. Maintain safe and stable housing free from drugs and provide proof of residency.

    Father stayed with various people in Topeka throughout the case and at one point left town. Father's attorney provided an address of his housing in Topeka, but due to a lack of documentation from Father and his inconsistent communication with the KVC, KVC was unable to confirm Father's housing. Father testified he had provided documentation to the receptionist at KVC.

    b. Obtain and maintain a legal source of income and provide proof of income.

    Father reported working for Frito-Lay, but, according to KVC, provided no documentation of employment. Without proper documentation, the KVC could not verify that Father had the means to properly provide for L.S.' basic needs. Father testified he had provided documentation to the receptionist at KVC.

3

c. Maintain monthly contact with KVC and provide any changes in residential and contact information within 24 hours.

Father was not regularly in contact with KVC. Consistent communication between Father and KVC did not begin until August 17, 2022, several months after the State's motion to terminate his parental rights was filed and two years after L.C. was removed from Mother's care.

d. Complete a drug and alcohol assessment and follow any recommendations.

Father did not complete his required regional alcohol and drug assessment center (RADAC) drug and alcohol assessment. But Father testified that about a year and half prior to the termination hearing he went to in-patient treatment.

e. Complete a mental health assessment and follow all recommendations.

Father did not show proof that he completed his mental health assessment. But Father testified that he did complete a mental health assessment with Valeo.

f. Complete court-ordered hair follicle tests.

Father completed his first test, and it was positive for methamphetamine use. Another test was completed over two years later, which was also positive for methamphetamine. Father contested the results of the later test, claiming that he was clean.

Because Father disputed the test results, he refused to comply with any other hair follicle tests requested by the KVC. Instead, before the termination hearing, he provided KVC with a screenshot of results from an at-home hair follicle test that showed Father's sample was negative for any illegal drugs, but KVC had no information how the sample was gathered, the chain of custody of the sample, or the reliability of the testing lab's results.

g. Participate in KVC's UA Color Code program.

Father provided the KVC with clean UA results obtained through his probation, but Father did not participate in KVC's UA Color Code program.

h. Participate in an age-appropriate parenting class and provide documentation.

Father submitted a certificate of completion of a parenting class into evidence at his termination hearing. The certificate showed the parenting class was completed three days before the start of the hearing. KVC staff testified that they could not speak to the content of the class, and if it was age appropriate for L.S.' parenting needs, because they were unaware before the hearing that Father had completed a parenting class.

But there was also evidence presented that staff at KVC told him to "[s]earch online parenting classes and choose one then show certifications once complete." So there did not seem to be any direction given to Father regarding what classes would be appropriate.

i. Sign all required releases with KVC.

There was no evidence presented by KVC concerning releases and Father testified that he had signed the required releases with KVC.

j. Refrain from any negative contact with law enforcement.

Father received multiple criminal charges, as well as three felony convictions, during the pendency of the case, and he failed to inform KVC of those charges.

3. Father visited with L.S. just one time in the first two and a half years after L.S. was removed from the home.

Father had one visit with L.S. at the beginning of the case. KVC reached out to Father to schedule a second visit, but he never responded. No other visits occurred until November 2022—two and a half years after L.S. was placed in DCF custody—when Father's family therapy began. At the time of the termination hearing, two family therapy sessions had taken place. A KVC family therapist who oversaw the sessions noted that during the first visit L.S. had limited interaction with Father, but the therapist did not note any concerning behaviors and testified that Father was very eager to establish a relationship with L.S.

During the second session, the therapist noticed "a couple" of concerning behaviors, which included L.S. having toys fight with each other and L.S. rubbing two plastic knives together like he was sharpening them with no emotion in his face.

After each session L.S. had significant regression, including fear of windows, crying at night for long periods, and a fear of sleep. It was believed this fear was based on the following.

In March 2019, L.S.' maternal grandmother was granted a protective order against Father because, among other things, Father had climbed up to Mother's window (at maternal grandmother's home where Mother and L.S. lived at the time) to intimidate Mother and had threatened to kill her. Testimony at the termination hearing also indicated that Mother claimed when L.S. lived with his parents, Father would have people coming in and out of the bedroom window at night. The therapist testified he was concerned L.S.' fear of windows could indicate a prior trauma had been triggered, but that L.S. was too young to be asked why he is exhibiting the behavior, and that even if it was age appropriate to engage in such questioning, L.S. may not even know. The therapist acknowledged it is hard to distinguish between behavior based on past trauma versus introduction to a new person.

KVC staff testified that Father could not achieve reintegration with L.S. any time soon based on his failure to demonstrate or document completion of case plan tasks and his track record of instability and nonparticipation throughout the life of the case. They opined, "[w]hen it comes to substance use and mental health, we often have to really see some stability over time, and after 31 months, we have not seen that from either parent. So I don't believe that it would be reasonable to ask [L.S.] to spend more time without permanency." They believed L.S.' best interests would be served by obtaining permanency through adoption because he had spent over 31 months of his 53-month-long life in DCF custody. The therapist testified that as of the date of the hearing, L.S. had no bond with Father, and it was difficult to say how long it would take to establish a bond.

According to Father, when he was released from in-patient rehab, he contacted his KVC case manager, who told him that she was going on vacation but when she returned,

7

she would contact him to start visits with L.S. According to Father, he never heard from that case manager again. Father testified that no one at KVC would return his calls.

Father acknowledged he lacked a bond with L.S. and had failed to do what was necessary to establish a bond.

4. Father presented a safety risk to Mother and ultimately L.S.

The former Director of the Topeka Rescue Mission Restore Hope program (Program), which works with victims of human trafficking, testified about their efforts to assist mother beginning in 2015 —identifying her as a victim of exploitation and human trafficking. They began providing her with numerous resources aimed at helping her. Although Mother began to show significant progress in removing herself from the exploitation and caring for her children, her behavior deteriorated in the summer of 2017 when she met Father.

In the Spring of 2018, Mother informed the Program that she was pregnant with L.S, and that the couple was moving to Tennessee. Program staff maintained contact with Mother, and sometimes she would say things were going well, and other times she would say she felt her life was in danger because of Father.

In August 2018, L.S. was born, and later that year Mother and Father returned to Topeka. While in Topeka, Mother contacted Program staff asking them to pick her up from a hotel, where Mother, Father, and L.S. were staying. She explained that she needed help from the Program to stay safe. Staff picked up Mother and L.S. and transported them to a safe house, but about two hours later, Father arrived at the safe house and picked them up. He apparently followed them there. Staff continued to communicate with Mother, but their attempts to get her and L.S. somewhere safe failed. Father's whereabouts were unclear.

8

Ultimately, DCF took custody of L.S., and while that was happening, Mother contacted the same Program staff member who was now working for another non-profit organization, Open Door Project (Project), that helps with advocacy and intervention for victims of exploitation, violent crime, and domestic abuse, and asked the staff member to be L.S.' placement. The staff member agreed, hoping she could help Mother achieve safety and reintegration with L.S. At first, Mother seized on the help offered to her and moved to a safe house. But while there, Mother began seeing Father again. Additionally, other men often came in and out of the safe house, in violation of the facility rules, and Mother regressed.

While living with the Project staff member, L.S.' crib was placed by a window, and he struggled to fall asleep at night and would often wake with night terrors. L.S. was "terrified of the window" when he first came to her house. She moved his crib away from the window and took the curtains down so L.S. could not see any movement from them and the night terrors stopped. After L.S.' first family therapy session with Father, L.S. refused to sleep in his room and was inconsolable for much of the night. At the time of termination hearing, L.S.' inconsolability had improved, but he was still having significant issues with going to sleep.

As to his dangerousness around Mother, Father testified Mother's past allegations of his violent conduct were not true, and he denied any violent past, including disputing the validity of past convictions in Tennessee for false imprisonment and domestic assault with bodily injury. He stated that they had a good relationship.

5. Father was a drug addict and dealer who was on probation for his crimes.

Father admitted he sold drugs to pay for his own drug of choice, heroin. He agreed that he was well into his addiction when L.S. was taken away from Mother. He admitted he was "not a nice person" when he was on drugs. But Father testified he had completed

drug treatment, and he was compliant with his probation (which included submitting to regular UAs).

After hearing and evaluating the testimony, the district court found Father unfit, that his unfitness was unlikely to change in the foreseeable future, and that it was in L.S.' best interests that Father's parental rights be terminated. The reasons given for its decision will be discussed in conjunction with Father's challenges to the district court's ultimate findings.

Given these conclusions, the district court terminated Father's parental rights to L.S.

Father now timely brings this appeal.

ANALYSIS

Father argues that the district court improperly terminated his parental rights to L.S. for three reasons.

First, he argues that there is no clear and convincing evidence on which the district court could conclude that he was unfit.

Second, he argues that the evidence presented at the termination hearing shows that his conduct and condition changed dramatically during the case, so even if at one point he was unfit to parent L.S., there was no evidence that such unfitness was unlikely to change in the foreseeable future.

Third, he argues that it was not in L.S.' best interests to terminate Father's parental rights to the child.

10

We will discuss each of Father's arguments in turn, but we begin with our standard of review.

A. *Our standard of review is clear and convincing evidence.*

A parent has a fundamental constitutionally protected liberty interest in the relationship with his or her child. See *Santosky v. Kramer*, 455 U.S. 745, 753, 759-60, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982); *In re B.D.-Y.*, 286 Kan. 686, 697-98, 187 P.3d 594 (2008). Because parental rights are fundamental, the State may extinguish the legal bonds between parent and child only upon clear and convincing proof of parental unfitness. K.S.A. 38-2269(a); *In re R.S.*, 50 Kan. App. 2d 1105, Syl. ¶ 1, 336 P.3d 903 (2014).

> "When the child has been adjudicated to be a child in need of care, the court may terminate parental rights or appoint a permanent custodian when the court finds by clear and convincing evidence that the parent is unfit by reason of conduct or condition which renders the parent unable to care properly for a child and the conduct or condition is unlikely to change in the foreseeable future." K.S.A. 38-2269(a).

When considering unfitness, the district court may consider a nonexclusive list of 15 conditions that singularly or in combination would amount to unfitness. K.S.A. 38-2269(b)-(e), (f).

An appellate court reviews a district court's termination of parental rights in the light most favorable to the State to determine whether we are "'convinced that a rational factfinder could have found it highly probable, i.e., by clear and convincing evidence, that the parents' rights should be terminated.'" *In re K.H.*, 56 Kan. App. 2d 1135, 1139, 444 P.3d 354 (2019). In our review, we will not "weigh conflicting evidence, pass on credibility of witnesses, or redetermine questions of fact." *In re B.D.-Y.*, 286 Kan. at 705.

11

B. *We examine Father's challenges to the district court finding of Father's unfitness.*

The district court found Father was unfit based on several statutory factors in K.S.A. 38-2269. We will address Father's challenges to each of those findings.

1. The use of intoxicating liquors or narcotic drugs of such duration or nature as to render the parent unable to care for the ongoing physical, mental, or emotional needs of the child—K.S.A. 38-2269(b)(3).

Father argues that the district court improperly found him unfit due to his past illegal drug use because (1) his past drug use alone did not render him unable to properly care for L.S., relying on *In re S.B.*, No. 120,362, 2019 WL 2479456, at *11 (Kan. App. 2019) (unpublished opinion), and (2) there was no evidence that Father was using drugs after September 2021. We find these arguments unpersuasive.

First, in *In re S.B.*, 2019 WL 2479456, at *11, the district court terminated the parents' parental rights based on their positive THC drug test results. There, the district court:

"made no findings about Mother's positive THC drug test. Moreover, although the trial court asserted that it considered the children's physical, mental, and emotional health needs at the conclusion of its findings, the trial court did not explain how either Mother's or Father's THC use would negatively affect the children's physical, mental and emotional health needs. In addition, the trial court never explained how either Mother's or Father's THC use would hamper their ability to properly care for children in the foreseeable future. Instead, the trial court took issue with the fact the parents failed drug tests." 2019 WL 2479456, at *11.

12

Because the district court in that case did not explain how the parents' drug use affected their ability to parent, the panel in *In re S.B.* reversed and remanded the district court's termination of the parents' parental rights. 2019 WL 2479456, at *12.

While no direct evidence relates to Father's drug use and its harm to L.S., indirect or circumstantial evidence can also support this finding. In *In re M.S.*, 56 Kan. App. 2d 1247, 1258-59, 447 P.3d 994 (2019), another panel of this court explained:

> "Any material fact may be proven not only by direct testimony, but also by indirect or circumstantial evidence, or by a combination of both. The State is not required to provide direct evidence that a parent's conduct is due to drug use if sufficient evidence shows that drug use impeded reintegration. Similarly, the State need not provide direct evidence that a parent's drug use is in and of itself harmful to a child where clear and convincing evidence shows that the parent's failure to acknowledge his drug issues creates a significant impediment towards reintegration. [Citations omitted.]"

Here, the court found that Father had an admitted history of heroin use, and, although he testified that he completed in-patient treatment in the fall of 2021, he failed to provide KVC with documentation of this task. The district court acknowledged that Father produced a negative hair follicle test, but agreed with KVC that there was no way for KVC to verify whether the sample was Fathers or "determine any indicia of reliability for the test." The district court found his refusal to comply with ordered drug testing inferred continued illegal drug use.

The district court also relied on Father's criminal drug convictions from May 2020 through September 2021, involving heroin and methamphetamine, to support its conclusion that Father's use of dangerous drugs rendered him unable to care for L.S. And while Father claimed that he was now clean, the district court found Father's testimony not credible for three reasons.

a. Father denied any violent criminal history, despite evidence to the contrary on his undisputed presentence investigation report.

b. Father's characterization of his relationship with Mother, and its lack of violence, was controverted by evidence at the termination hearing.

c. Father failed to complete UAs with KVC, had a positive hair follicle test for methamphetamine in August 2022 (after he completed in-patient drug treatment), and refused to get a follow up hair follicle test with a KVC-approved lab.

Finally, Father testified that for the first year and a half of the case he was "killing" himself "with drugs," which prevented him from seeing or bonding with L.S. The evidence was undisputed that L.S. and Father had no bond because of his lack of participation in L.S.' life. This lack of bond, created by Father's drug use, impeded reintegration efforts. The district court concluded that the evidence showed that Father's dangerous drug use was on-going, which rendered him unfit to properly care for L.S. We do not reweigh that credibility finding. *In re B.D.-Y.*, 286 Kan. at 705.

So while there may not be direct evidence that Father's drug use was itself harmful to L.S., there is clear and convincing evidence that his failure to acknowledge and meaningfully address his drug issues created a significant impediment towards reintegration.

2. Failure of reasonable efforts made by appropriate public or private agencies to rehabilitate the family and Father's failure to carry out a reasonable plan of reintegration—K.S.A. 38-2269(b)(7) and K.S.A. 38-2269(c)(3).

14

Next, Father argues that the KVC failed to provide reasonable efforts to rehabilitate the family. He claims that he carried out the plan provided to him. This argument combines the district court's unfitness findings under K.S.A. 38-2269(b)(7) and K.S.A. 38-2269(c)(3).

Father agrees that efforts expended by the KVC must be reasonable but are not required to be effective. See *In re M.S.*, 56 Kan. App. 2d at 1257. He also agrees that parents must exert some effort in accomplishing their plans tasks, but KVC must also provide the parents with the opportunity to succeed. See *In re T.H.*, 60 Kan. App. 2d 536, 554, 494 P.3d 851 (2021). Father argues that rather than focusing on reintegrating Father with L.S., KVC relied on the "delusional ramblings of the child's mother" and used those to write him off from the outset of the case. We disagree.

By his own admission, Father did not attempt to contact KVC until August or September 2021, and that contact was sporadic until August 2022, when Father decided it was time to start working on his case plan tasks. The court found that Father essentially stopped engaging with rehabilitation efforts. He attended only two of the six court hearings on the case, going two years between attending hearings. The evidence showed that there was no meaningful attempt on Father's part to contact KVC until August 2022.

The district court also took judicial notice that even though Father had no contact with KVC for long stretches of time, he was appearing in court for his criminal cases. In other words, he was appearing in court on his criminal cases, but inexplicably not on his pending CINC case. "Father provides no reason as to why he did not undertake the same diligence to ascertain and attend his court hearings" for his parental rights case as he did in his criminal case.

The court found that Father's testimony that he made repeated failed attempts to contact KVC was not credible. Instead, the evidence showed that once Father's attorney

15

provided Father's updated information to KVC, case workers reached out three times to Father before receiving a response. And KVC's documented communications with Father do not show KVC neglected communicating but attempted to communicate several times with Father.

The district court noted that Father was not diligent in his attempts to communicate with KVC to work his case plan until five months *after* the State's motion to terminate his parental rights was filed and over two years since L.S. entered state custody. Once Father reached out, he was adamant that KVC work on *his* timeline and begin immediate reintegration with L.S. But at that point L.S. did not know Father. The district court elaborated that K.S.A. 38-2269(b)(7) requires reasonable efforts, not "effective or exhaustive efforts," to rehabilitate the family. Accordingly, KVC must provide the parent with the opportunity to succeed, but the parent must also exert some effort. Father did not exert any effort until the last minute. As a result, the district court found clear and convincing evidence that, despite reasonable efforts of public and private agencies, Father failed to provide a safe and stable environment for L.S.

Father alleges that he completed all his reintegration plan tasks. This assertion varies from the evidence presented at the termination hearing. Father testified that he was renting a room from a friend, but he did not document his housing with KVC. KVC had multiple addresses for Father throughout the pendency of the case, indicating that he often moved.

Father testified that he worked at Frito-Lay, but he never provided paystubs to KVC so it could verify Father's employment and his ability to provide for L.S.' basic needs.

KVC had no documentation of Father completing a RADAC assessment or following any of its recommendations. Similarly, the KVC had no documentation of

16

Father completing a mental health assessment or following any of its recommendations. Father testified that he had completed an evaluation at Valeo, but that Valeo would not supply verification of such.

Father completed two hair follicles tests throughout the entire case, and both were positive for methamphetamine. Sometime between the August 2022 hearing and the December 2022 hearing, Father provided KVC with records of his UAs taken as a condition of his probation, but KVC did not have an indication if these UAs were random and observed like the UAs completed through the KVC's Color Code program.

Although Father did complete a four-hour-long online parenting class three days before the termination hearing, Father had multiple negative contacts with law enforcement during the life of the case. He received three felony convictions during that time, none of which was reported to KVC.

The evidence at the termination hearing showed that while Father had attempted in the lead up to the hearing to complete a handful of tasks, Father showed no stability in his progress and failed to complete the majority of his case plan tasks—even though the case was pending for three years. Evidence to the contrary was deemed not credible by the district court, and we will not reweigh evidence. See *In re B.D.-Y.*, 286 Kan. at 705. Accordingly, a rational fact-finder could have found it highly probable that KVC's reasonable efforts to rehabilitate Father did not succeed and Father failed to carry out a reasonable plan of reintegration. See *In re L.M.B.*, 54 Kan. App. 2d 285, 303, 398 P.3d 207 (2017) (agreeing with the district court that parents' late attempts to comply with the case plan were "too little, too late"). The district court's findings on these two factors of unfitness were supported by clear and convincing evidence.

Moreover, such an extended period of out-of-home placement allows the court to presume unfitness under this factor and the burden shifts to Father to rebut the presumption. K.S.A. 38-2271(a)(5). Father fails to meet his burden.

3. Lack of effort by the parent to adjust the parent's circumstances, conduct, or condition to meet the needs of the child—K.S.A. 38-2269(b)(8).

Father argues that the district court erred when it found clear and convincing evidence that he did not try to adjust his circumstances, conduct, or conditions to meet the needs of L.S., under K.S.A. 38-2269(b)(8). Specifically, he argues that after his final arrest in June 2021, he made drastic changes to meet the needs of L.S. He alleges these drastic changes included obtaining and maintaining full-time employment, checking himself into in-patient drug treatment, having long-term, stable housing, and maintaining compliance with his drug treatment and probation programs.

The district court found that Father failed to change his life until he was convicted of multiple felonies during the life of the case. Father failed to provide any documentation to corroborate the services he claimed to receive. Nor would he provide any documentation to KVC regarding his housing, employment, or mental health assessment. Father had a hair follicle test positive for methamphetamine well into the life of the case, in August 2022, and refused to take any more tests or participate in KVC's UA Color Code program. The district court did note that Father took one parenting class, but it was completed just days before the termination hearing, which was three years after the CINC case was filed and nearly nine months after the motion to terminate his parental rights was filed. In the meantime, L.S. had spent three quarters of his life waiting for Father to make the necessary changes to start attempting to turn a nonexistent parental bond into a healthy and safe custodial relationship.

18

Just as with the previous finding, a rational fact-finder could have found it highly probable that Father's efforts to change his circumstances to meet the needs of L.S. were not sufficient. The district court's findings on this factor of unfitness were supported by clear and convincing evidence.

4. Because L.S. had been in an out-of-home placement for more than two years, the district court also found Father unfit based on his failure to maintain regular visitation, contact, or communication with the child or with the custodian of the child—K.S.A. 38-2269(c)(2).

Father argues that the district court erred in finding Father unfit under this factor. Father argues he "practically begged" to have visits with L.S., but "[t]he only people cancelling the visits were the [A]gency." The court found that Father, until family therapy began in November 2022, had only one visit with L.S., which occurred at the outset of the case. Towards the end of the case, Father had two visits with L.S. during family therapy sessions. In total, Father had three visits with L.S. since the case began. The district court concluded that the State submitted clear and convincing evidence to establish unfitness on these grounds.

A review of the record before us supports the district court finding. It reveals that while Father claims he was begging for visits with L.S. any such "begging" did not occur until September 2022—over two years after the case was initiated. Father claimed during his testimony that he contacted KVC in August or September 2021 and that multiple contacts went unanswered by KVC. But the district court found this claim to not be credible and we will not reweigh that evidence. See *In re B.D.-Y.*, 286 Kan. at 705.

Father relies on *In re G.D.*, No. 124,641, 2023 WL 2194548, at *4-5 (Kan. App. 2023) (unpublished opinion) to support his position, but his reliance is misplaced. In that case, another panel of this court held that clear and convincing evidence did not support

19

the district court's finding that the mother was unfit due to her lack of visitation because the record reflected that the mother was prohibited from seeing the children for the first part of the case and the record was unclear on efforts to see the children after the prohibition was lifted. Here, there was no court order prohibiting Father from seeing L.S. until October 13, 2020, which required Father have two consecutive clean UAs before visits with L.S. That condition was completely in the control of Father. The record reflects that Father's lack of contact with KVC is what directly impacted his ability to see L.S., which then impacted their bond.

Father had three visits with L.S. from May 2020 until January 2023. Two of those visits were therapeutic. Father claims that KVC was the only one who cancelled visits. The record reflects that, because of Father's persistence in the fall of 2022, KVC scheduled a nontherapeutic, but supervised, visit between Father and L.S., to occur in October 2022 even though the case workers were not convinced it was in L.S.' best interests. Upon further consideration of what was best for L.S., KVC cancelled the visit and determined visits needed to happen in a therapeutic setting. Once therapeutic visits began with Father and L.S. in November 2022, L.S. had concerning regressions in his behavior.

Clear and convincing evidence supports the district court's finding that Father was unfit because he failed to maintain regular visitation, contact or communication with L.S. Father was essentially a nonparticipant at the beginning of the case until he decided five months after the motion to terminate his parental rights was filed to begin participating in the case meaningfully. At that point he and L.S. had no bond because of Father's failure to maintain regular contact and visitation with L.S.

Moreover, such an extended period of out-of-home placement allows the court to presume unfitness under this factor and the burden shifts to Father to rebut the presumption. K.S.A. 38-2271(a)(5). Father fails to meet his burden. In fact, he admitted

20

during the hearing that he had no bond with L.S. and had failed to do what was necessary to establish a bond.

Given that all five of the factors on which the district court found Father to be unfit were supported by clear and convincing evidence—even though termination could be based on only one, we now assess the district court's conclusions about whether Father's unfitness was unlikely to change in the foreseeable future. See K.S.A. 38-2269(a).

C. *We examine the factors on which the district court based its finding that Father's unfitness was unlikely to change in the foreseeable future.*

Courts liberally construe the Revised Kansas Code for Care of Children to "acknowledge that the time perception of a child differs from that of an adult and to dispose of all proceedings under this code without unnecessary delay." K.S.A. 38-2201(b)(4). The foreseeable future is examined from the child's perspective because children have a different perception of time than adults, and a child has a right to permanency within a time frame reasonable to them. *In re E.L.*, 61 Kan. App. 2d 311, 328, 502 P.3d 1049 (2021).

In assessing whether a parent's unfitness is "'unlikely to change in the foreseeable future,'" the district court may look to a parent's past conduct as an indication of future conduct. 61 Kan. App. 2d at 328.

The foreseeability of a parent's continued unfitness is a factual determination to be made by the district court that must be supported by clear and convincing evidence. See K.S.A. 38-2269(a); *In re B.D.-Y.*, 286 Kan. at 705.

The district court held that while Father presented evidence that he may have recently turned his life around, L.S. had been with the DCF placement for almost three years and during that time had virtually no contact with Father. It concluded that "[a] complete lack of parental bond, based on Father's conduct, is a condition that will not change in the foreseeable future." The district court added that Mother and Father's relationship was credibly classified as abusive and their refusal to acknowledge it as such indicated that their conduct was unlikely to change in the foreseeable future.

The evidence supports these conclusions. As already discussed at length, while Father appeared to be successfully participating in his probation, he refused to fully comply with the case plan tasks. Father's pattern of behavior over the course of the case indicates that his unfitness was unlikely to change in the foreseeable future. KVC workers testified that stability in working a case is important, especially in cases involving drug addiction issues. Here, Father did not start working on his case plan tasks until he decided to, not when L.S. needed him to, which was from the first day L.S. entered DCF custody. The district court's holding is properly supported.

*D. We examine the factors on which the district court based its finding that termination of Father's parental rights was in L.S.' best interests.*

Finally, the termination of a parent's rights to his or her child cannot occur unless such termination is in the best interests of the child. See K.S.A. 38-2269(g)(1). In making this determination, the court must "give primary consideration to the physical, mental and emotional health of the child." K.S.A. 38-2269(g)(1).

The best-interests determination depends on a preponderance of the evidence and is reviewed for an abuse of discretion. See *In re R.S.*, 50 Kan. App. 2d 1105, 1115-16, 336 P.3d 903 (2014). A district court abuses its discretion if no reasonable person would

22

agree with the district court, or the court premised its decision on a factual or legal error. 50 Kan. App. 2d at 1116.

This consideration "requires the court to weigh the benefits of permanency for the children without the presence of their parent against the continued presence of the parent and the attendant issues created for the children's lives." *In re K.R.*, 43 Kan. App. 2d 891, Syl. ¶ 7, 233 P.3d 746 (2010). In making this determination, the court "must consider the nature and strength of the relationships between the children and parent and the emotional trauma that may be caused to the children by termination of the parental rights, weighing these considerations against a further delay in permanency for the children." 43 Kan. App. 2d 891, Syl. ¶ 7.

Here the district court concluded that it was in L.S.' best interests to terminate Father's parental rights, giving primary consideration to L.S.' physical, mental, and emotional health. The district court found that clear and convincing evidence established that when L.S. entered placement, he was "suffering from severe behaviors, to include night terrors and fear of windows." But through the stability and security with his consistent placement, who is also his adoptive resource, he is now thriving, and his previous disruptive behaviors only returned after resuming contact with Father. The district court emphasized that L.S. does not know Father, and L.S. considers his current placement to be his mother and father. It noted there was no evidence that terminating Father's parental rights would result in any emotional trauma to L.S. Ultimately, the district court concluded that clear and convincing evidence established that "based on the need for [L.S.] to obtain permanency, the length of time he has been in DCF custody, and the unlikelihood that reintegration can occur in the foreseeable future, if at all, termination of [Father's] parental rights is in [L.S.'] best interests."

These conclusions are supported by a preponderance of the evidence. First, the evidence of L.S.' behavioral disturbances was uncontroverted at the termination hearing.

Second, by Father's own admission, he has no bond with L.S. The therapist who attended the two therapeutic visits also testified that Father had no bond with L.S. and that it was difficult to say how long it would take to establish a bond between the two. Third, at the time of the hearing, L.S. had spent over 31 months of his 53-month-long life with his placement and was bonded with placement.

Although Father made some progress on completing parts of the permanency plan, he spent years stagnating on others. In that time, Father did not show he could properly care for and bond with L.S. Under these facts, the district court's finding that termination of Father's parental rights was in the child's best interests was not arbitrary, fanciful, or unreasonable and was not based on an error of fact or law.

Affirmed.