NOT DESIGNATED FOR PUBLICATION

Nos. 127,621
127,622
128,393

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interests of N.M., E.M. and Z.L.,
Minor Children.

MEMORANDUM OPINION

Appeal from Bourbon District Court; ELIZABETH SWEENEY-REEDER, judge, and VALORIE R. LEBLANC, magistrate judge. Submitted without oral argument. Opinion filed January 17, 2025. Affirmed.

*Burton M. Harding*, of Harding Law Firm, LLC, of Mound City, for appellant natural father.

*Brandon D. Cameron*, assistant county attorney, for appellee.

Before ARNOLD-BURGER, C.J., GARDNER and COBLE, JJ.

PER CURIAM: The Bourbon County District Court terminated R.M.'s (Father) parental rights to his children N.M., E.M., and Z.L. All three cases were consolidated on appeal. Father appeals, arguing there was not substantial competent evidence to support the court's findings of parental unfitness and that the court abused its discretion in finding termination of his parental rights was in the best interests of his children. After review, we affirm the district court's termination of Father's parental rights.

1

Father has three children with E.L. (Mother): N.M. (YOB 2014), E.M. (YOB 2016), and Z.L. (YOB 2018). He also has several other children, from four different mothers, both older and younger than the children that are the subject of this case.

Mother and Father were in an on-again, off-again relationship from 2009 to 2019. Z.L. was three months old in July 2018 when she was removed from Mother's custody for failure to thrive. She was malnourished, very weak, and Mother was using a pacifier rather than a bottle to feed the child. Z.L. was also jaundiced. KVC had been alerted to the situation two months earlier, but when Z.L. was admitted to the hospital, she was removed from the home. Mother and Father were not living together at the time. Mother identified the man she was living with as Z.L.'s father. But shortly thereafter Mother suggested Z.L.'s biological father was Father. Z.L. was placed in foster care with W.P., where she remains to this day. In October 2018, Father was identified as Z.L.'s biological father by court-ordered testing.

By November 2018, Z.L.'s permanency plan included Father. The social file noted that Father was receiving family preservation services for his older children with Mother, N.M. and E.M. By February 2019, as part of the reintegration plan, Father was required to follow a previously completed mental health assessment and attend individual therapy every two weeks. Father indicated he owned his own home, and he was required to show proof that he maintained housing in his own name. It was also noted that Father had a history of bed bugs in his home and one of his children, N.M. had several bouts of head lice. He was required to notify KVC if his home became infested again.

N.M. and E.M. were placed in state custody in September 2019. At that time, the State filed petitions alleging the children were children in need of care (CINC) because they lacked adequate parental care and were without the care or control necessary for

their physical, mental, or emotional health based on the Kansas Department for Children and Families (DCF) reports that showed physical neglect, physical abuse, sexual abuse, medical neglect, and lack of supervision. There was a concern that Father's home contained a large amount of clutter that presented a danger to the children, animal feces, and unsanitary conditions. The children were not bathed and often had severe bug bites. N.M. and E.M. have remained in state custody, with out-of-home placement, since that time.

In October 2019, the district court adjudicated all three children as children in need of care, based in part on a stipulation by Father. In June 2020, visitation was suspended due to a bed bug infestation at Father's home.

Two years after the children were removed from the home, in September 2021, the State filed motions for termination of parental rights after determining reintegration with either parent was no longer viable. The State alleged both parents were unfit due to multiple statutory factors, including a presumption of unfitness under K.S.A. 38-2271(a)(6)(A) and K.S.A. 60-414(a) because the children had been in an out-of-home placement under court order for a cumulative total period of two years or longer, Mother and Father had failed to carry out a reasonable parenting plan, and there was a substantial probability they would not carry out such plan in the near future. It was noted in the accompanying points of the severance report that Father failed to follow through with and apply parenting skills learned in class. It was noted that Father has not established a bond with Z.L.

Mother eventually voluntarily relinquished her parental rights, so she is not a party to this action.

The district court held an evidentiary hearing over four days in November and December 2021, after which the court took the matter under advisement. The court found

3

that the State had failed to prove Father's parental unfitness. But the court explained there would need to be "significant progress" toward reintegration or "the State's next motion to terminate may result in a very different outcome" and that the court would consider "the totality of the evidence not just what has occurred from today forward in making that decision." Father began working on a new case plan with a goal of reintegration.

Almost a year later, in August 2022, the State filed a new motion for termination of parental rights. Like the previous motions, the State alleged Father was unfit due to multiple statutory factors, including a presumption of unfitness applied under K.S.A. 38-2271(a)(6)(A).

The district court held the evidentiary hearing on the State's motion over two days in April 2023. Because a different judge ruled on the State's 2021 motion for termination of parental rights, the court began by taking judicial notice of the prior judge's rulings and the evidence from the four-day evidentiary hearing on that prior motion. The court also admitted the court reports prepared throughout the case and various case plans as exhibits. Facts developed at both hearings and in the court reports will be referred to as they relate to each of the court's subsequent findings terminating Father's parental rights.

At the conclusion of the hearing, the district court took the matter under advisement and about two months later announced its ruling at a separate hearing. The court explained it was terminating Father's parental rights after concluding the State had proven Father's parental unfitness by clear and convincing evidence and that termination was in the best interests of all three children. The court determined Father was unfit under K.S.A. 38-2269(b)(4), (b)(8), and (b)(9), as well as the statutory presumption of unfitness under K.S.A. 38-2271(a)(6), explaining as follows:

> "Father has failed to complete case plan tasks including not obtaining adequate housing, failing to participate in mental health and follow recommendations, failing to

4

participate and complete family therapy, visits have negatively impacted the children, failed to attend several school functions, and doctor appointments for the children, and father has been unwilling to change his conduct and circumstances to meet the needs of the minor children. Agencies have provided services to the[] family to assist with reintegration and reintegration has been unsuccessful.

"The Court found that the State presented sufficient evidence to establish a presumption of unfitness concerning the natural father pursuant to K.S.A. 38-2271(a)(6), such presumption was supported by 60-414(a) evidence, and natural father failed to rebut the presumption of unfitness."

Father now appeals.

ANALYSIS

I.     *We examine the statutory framework and our standard of review.*

A parent has a fundamental liberty interest protected by the Fourteenth Amendment to the United States Constitution to make decisions regarding the care, custody, and control of the parent's child. Before a parent can be deprived of the right to the custody, care, and control of the child, the parent is entitled to due process of law. *In re P.R.*, 312 Kan. 767, 778, 480 P.3d 778 (2021). But this fundamental right to parent is not without limits. 312 Kan. at 778. Because child welfare is a matter of state concern, the State can intervene to assert its interest "through state processes designed to protect children in need of care." *In re A.A.-F.*, 310 Kan. 125, 146, 444 P.3d 938 (2019).

Before terminating a person's parental rights, a district court must find the State has proven by clear and convincing evidence that the parent is unfit and that the conduct or condition which renders the parent unfit is unlikely to change in the foreseeable future, and by a preponderance of the evidence that termination of parental rights is in the best

5

interests of the child. K.S.A. 38-2269(a), (g); *In re R.S.*, 50 Kan. App. 2d 1105, Syl. ¶¶ 1-2, 336 P.3d 903 (2014). When reviewing a finding of parental unfitness, we must consider all the evidence in a light most favorable to the State as the prevailing party to determine whether "a rational fact-finder could have found that decision 'highly probable, i.e., [supported] by clear and convincing evidence.'" *In re M.S.*, 56 Kan. App. 2d 1247, 1255-56, 447 P.3d 994 (2019) (quoting *In re B.D.-Y.*, 286 Kan. 686, 705, 187 P.3d 594 [2008]). We will not reweigh evidence, pass on the credibility of witnesses, or decide disputed questions of fact. *In re M.S.*, 56 Kan. App. 2d at 1256.

Here, the district court found Father presumptively unfit under K.S.A. 38-2271(a)(6), which applies if the State proves by clear and convincing evidence:

> "(6)(A) the child has been in an out-of-home placement, under court order for a cumulative total period of two years or longer; (B) the parent has failed to carry out a reasonable plan, approved by the court, directed toward reintegration of the child into the parental home; and (C) there is a substantial probability that the parent will not carry out such plan in the near future."

Once the presumption is properly invoked, the burden shifts to the parent to rebut the presumption by a preponderance of the evidence. "In absence of proof that the parent is presently fit and able to care for the child or that the parent will be fit and able to care for the child in the foreseeable future, the court shall terminate" the parent's parental rights. K.S.A. 38-2271(b).

The district court also determined that clear and convincing evidence independently supported a finding of parental unfitness under several factors listed in K.S.A. 38-2269(b), including:

> "(4) physical, mental or emotional abuse or neglect or sexual abuse of a child;

6

. . . .

"(8) lack of effort on the part of the parent to adjust the parent's circumstances, conduct or conditions to meet the needs of the child; and

"(9) whether, as a result of the actions or inactions attributable to the parent and one or more of the factors listed in subsection (c) apply, the child has been in the custody of the secretary and placed with neither parent for 15 of the most recent 22 months beginning 60 days after the date on which a child in the secretary's custody was removed from the child's home."

"The existence of any one of the above factors standing alone may, but does necessarily, establish grounds of termination of parental rights." K.S.A. 38-2269(f). So we turn to examination of whether the evidence is sufficient to support the district court's findings.

II.    *Clear and convincing evidence was presented from which the district court could conclude that the presumption of unfitness under K.S.A. 38-2271(a)(6) applied.*

   A.    *Time in State Custody*

There is no dispute that N.M., E.M., and Z.L. have been in the State's custody for more than two years. Father concedes that he has been working on this case for around four and half years as of the date of the hearing. Thus, the record contains clear and convincing evidence that all three children were in out-of-home custody for around three and a half years, satisfying K.S.A. 38-2271(a)(6)(A).

   B.    *Failure to Complete Required Case Plan Tasks to Allow Reintegration*

Likewise, clear and convincing evidence established that Father failed to complete required tasks under the case plan to allow reintegration to occur under K.S.A. 38-2271(a)(6)(B) and K.S.A. 38-2269(c)(3).

7

1. *Father was prevented from having unsupervised or overnight visits in his home for a significant amount of time because he did not have suitable housing.*

From 2017 to 2022, Father lived rent free in a 980 square foot, two-bedroom, farmhouse owned and occupied by G.G. This was in exchange for Father working on G.G.'s 1,000-acre ranch. Keeping the house clean and safe has been a constant struggle throughout the case. Father was allowed unsupervised overnight visits with his children in G.G.'s home for a few months at the beginning of the case, until, in January 2020, when they were stopped because the home had general clutter around the house, bed bugs, cockroach and rodent infestations, unsanitary conditions, and an electrical pole outside the house that was a danger to the children. It had no running water in the bathroom sink. One bedroom had no heat in the winter, and there was hole in the bathroom floor.

Many people lived in this very small house over the course of this case including various friends of Father, farmhands on the ranch, girlfriends, and his latest wife.

As indication that the same problems continued unabated, in April 2022, home visitation had to be suspended yet again due to a bedbug infestation which was not treated until May 2022. While Father moved into a bigger home in late 2022, case workers raised several concerns about unsafe conditions in Father's new home. They monitored a visit there and noted it was appropriate for visits but was cluttered and only had two bedrooms.

Father then moved to his current home, which was larger but there were still concerns preventing reintegration including "exposed wood [and] clutter that still needs to be cleaned." Father agreed there was clutter but explained that those issues had either already been resolved or were easily remedied. While Father claims those issues were overblown or that they could be or were already fixed, additional testimony presented by

the State shows that Father routinely struggled to obtain adequate housing over the life of the case.

In sum, from October 2022 (after the first termination hearing) to the date of the last hearing in April 2023, Father lived in four different homes. At the time of the hearing, he had just lived in his current home for a few months, and he had just cleaned it a week before his hearing.

### 2. *Father chose to marry and live with a woman who he was warned could not pass the background check to be around his children.*

In June 2021, Father married a woman who his caseworker warned him may not be able to pass the background check. If he did so, she advised him it would severely impact his ability to reintegrate with his children. He did, anyway, seemingly putting his needs before those of his children. His new wife had pleaded no contest to allowing her boyfriend to abuse her child in 2018. She relinquished her parental rights to the child to her mother. She was also convicted in the spring of 2019 of battery of a correctional office and trafficking in contraband in a correctional facility. She was scheduled to be on probation until March 2024. She tested positive for drugs in October 2021—after she and Father were married.

### 3. *When Father was given an opportunity for extended visits, he failed to adequately care for the children.*

Father struggled to get his children to or from school and other activities when he last had unsupervised visits in January 2021. He failed to pick the children up and take them to mental health visits and sent them to school unbathed and dirty. He did not have sufficient room in the home for his children, G.G., himself, and other friends that would be allowed to stay there.

9

Even in the months leading up to the second hearing in 2023, he did not show up for the children's events when he said he would. In addition, during the school year encompassed by the last hearing date, he stopped staying in contact with the children's school.

In the three years preceding the final hearing, Father had a total of six overnights visits with the children.

4. *Father failed to attend his own mental health appointments and failed to properly engage and learn from family therapy.*

Father attended only nine of 20 scheduled visits with his therapist. He was being treated for post-traumatic stress, anger management, and easy agitation.

Family therapy was a case plan task geared at allowing Father to bond with his children, so failure to make progress prevented reintegration as well as supported a statutory finding of unfitness under K.S.A. 38-2269(b)(8).

Family therapy was ordered and initiated on September 30, 2021. There was a total of 13 sessions before family therapy was terminated after the June 2022 session. The sessions resulted in chaos, with the children regressing in their behaviors. Father had to be redirected frequently to stop focusing only on N.M. and not engaging with the other children. Even after meeting with Father for an hour after each session, discussing different activities to engage in to promote safety and bonding, Father made no progress. On July 7, 2022, the family therapist met with caseworkers and Father and stated she could not ethically continue with the sessions when no progress was being made. Father was not following up with the homework to make the sessions successful. The family therapist felt it was actual damaging the mental health of the children.

10

Father asked the therapist if she would participate in Zoom sessions with him on the weekends "where [the therapist] would give suggestions and things he could do; one was safety" and the therapist agreed. The therapist set up the appointment with Father, sent a reminder, and he did not show up or request to set up anymore in the future.

C.     *Father Failed to Rebut the Statutory Presumption of Unfitness*

Once we find that the presumption has been properly applied, the burden shifts to Father to establish that he is presently fit and able to care for his children or that he will be fit and able to care for his children in the foreseeable future. K.S.A. 38-2271(b).

On appeal, Father does not argue the district court erred in finding the State met its burden of proving the statutory presumption, nor that he failed to rebut the presumption. Instead, Father contends generally that the evidence showed he was denied a fair chance to reintegrate with his children and that he was making significant progress toward completing his case plan tasks. Because Father does not explain how the court erred in applying the statutory presumption of unfitness or individually address evidence which sufficiently contradicts the statutory factors the district court relied on, he has waived or abandoned those arguments. See *In re Adoption of Baby Girl G.*, 311 Kan. 798, 803, 466 P.3d 1207 (2020); see also K.S.A. 38-2269(f) (existence of any one factor standing alone may, but does not necessarily, establish grounds for termination of parental rights). Nevertheless, we will address the alternative bases upon which the court ruled.

III.    *Clear and convincing evidence independently supported a finding of parental unfitness under several factors cited by the district court.*

The district court also determined that clear and convincing evidence independently supported a finding of parental unfitness under several factors listed in K.S.A. 38-2269. We will examine the sufficiency of the evidence to support each,

11

keeping in mind that "[t]he existence of any one of the above factors standing alone may, but does necessarily, establish grounds of termination of parental rights." K.S.A. 38-2269(f).

A.    *Physical, Mental, or Emotional Abuse or Neglect or Sexual Abuse of a Child—K.S.A. 38-2269(b)(4)*

Although the district court's journal entry reflects it found Father unfit under K.S.A. 38-2269(b)(4) because of "mental abuse," the State pursued termination of Father's parental rights under this factor based on "[p]hysical, mental, or emotional *neglect*." (Emphasis added.) Abuse and neglect are separately defined under the Revised Kansas Code for Care of Children (Code), K.S.A. 38-2201 et seq. Relevant to this appeal, neglect includes:

> "[A]cts or omissions by a parent, guardian or person responsible for the care of a child
> resulting in harm to a child, or presenting a likelihood of harm, and the acts or omissions
> are not due solely to the lack of financial means of the child's parents or other custodian."
> K.S.A. 38-2202(t).

1. *Mental or emotional neglect of N.M.*

The evidence established that Father exhibits a clear preference for N.M and directs all of his attention toward her when they are together. He over-shares adult problems with her, and she has developed anxiety and conduct disorder. She expresses that she has to act like an adult because her parents behave as children. Because her parents have broken so many promises to her, she cannot count on them. Father has forgotten to pick her up from counseling and failed to show up at school events that he says he will. She feels she is the one who has to try to hold the family together. As early as eight years old, she was seen trying to comfort and refocus her Father when he became upset—the child becoming the parent. But she also displays rage when she returns from

12

visits with Father, hitting E.M. with a closed fist and being defiant with her foster mother. This is usually related to Father having promised her something and not delivered.

### 2. *Mental or emotional neglect of E.M.*

Father admits that he gives very little attention to E.M. Testimony supports a finding that Father mostly ignores him, even though E.M. clearly craves his Father's attention. Father admits he does not know how to interact with E.M. and their bond is tenuous.

As a result, E.M. suffers from self-harming behaviors and speech problems. He is very anxious and has numerous tics that increase when he is having a visitation with his Father or approaching or returning from one. He will punch himself in the face or lick his lips until they bleed. He is focused on smell, and smells things obsessively. For the two years prior to the final hearing, E.M. has seen a therapist for weekly sessions. Although he was seven years old, he would wet himself during what became very chaotic family therapy sessions. When he asked to go to the bathroom, Father would not take him.

To exacerbate E.M.'s low self-esteem, Father told N.M. that he was not E.M.'s biological father and N.M. conveyed this information to E.M. This proved very upsetting to E.M. He did not feel his dad paid any attention to him, and he decided he did not want to see him anymore. Although he has shown improvement since family therapy sessions have ended, his teachers indicate that his behavior deteriorates the day of and the day after visits with Father. Father did not attend E.M.'s extracurricular activities, even though E.M. asked him to. E.M. suffers from incontinence, both bowel and bladder, after and/or before visits with Father.

3. *Mental or emotional neglect of Z.L.*

Z.L. has virtually no relationship with Father. They have no bond. She was taken from Mother before Father had been legally identified as the biological father, so she has always recognized her foster parents as mom and dad. She feels very anxious before and after visits with Father, and she too has wet herself during family therapy sessions or she will crawl into a bottom bookcase shelf and cry. She too has done well since family therapy sessions were terminated. She often refuses to attend visits.

B.      *Lack of Effort on the Part of the Parent to Adjust the Parent's Circumstances, Conduct, or Conditions to Meet the Needs of the Child— K.S.A. 38-2269(b)(8)*

1. *Failure to meaningfully participate in family therapy sessions*

During family therapy sessions, Father would focus only on N.M. and the therapist would have to redirect him and reengage him in the session. Although the therapist spoke after each session for an hour with Father going over what happened in the session and giving him relationship homework to work on before the next session, he made no progress.

2. *Failure to interact during in-home visits*

When in-home visits took place, Father focused mostly on the television or his phone, while his girlfriend or roommate prepared food for the children. Even though this was explained by the girlfriend and roommate as necessary so the Father could focus on interacting with the children for the short time they were together, Father was not interacting with the children. They were each watching their own televisions, not interacting with each other.

14

### 3. *Placing visitation in jeopardy by marrying someone who could not pass a background check*

Father married a woman who could not pass a background check, then lied about it to social workers because he was aware that it could jeopardize visitation and reintegration with his children. Yet he chose to do it anyway.

### 4. *Failure to interact during visits at the TFI facility*

At the time of the last hearing, after four years, Father was still only receiving supervised after-school visits with his children once a week from 4 to 7 p.m. at the TFI facility. He would seldom bring snacks, even though the children were hungry and thirsty. He had to be prompted to give E.M. his scheduled medicine. During some of these visits he spent much of his time on the phone and provided little supervision.

At one visit, shortly before the final hearing, E.M. threw himself on the floor, hit his head, and was sobbing—saying he wanted to leave with his foster mother. Father did not even get up off the couch to check his condition. He simply said, "'I don't force him to stay. If he wants to leave, let him leave.'"

### 5. *Missing children's appointments and activities*

From October 2022 to April 2023, Father missed Z.L.'s speech assessment, case plan meeting, eye appointment, I.E.P., doctor's appointment, school program, 28 of her gymnastics classes, and her Christmas program. He missed E.M.'s Christmas program, 14 of his karate classes, and two doctor's appointments. He missed N.M.'s eye appointment, 2 out of 6 of her volleyball games, and 7 out of 27 of her gymnastics classes. Father also failed to attend Z.L.'s or N.M.'s gymnastics meet.

15

6. *Lack of adequate housing*

At the time of the final hearing, Father had just obtained his latest home for the children. He struggled throughout the case to recognize the need for a home that was big enough for his children and the others who he chose to let live there. He struggled to make sure the house was clean, sanitary, and safe, free of bedbugs, lice, and clutter. In home visits were suspended more often than not due to inadequate and/or unsafe housing.

C. *"[A]s a result of the actions or inactions attributable to the parent and one or more of the factors listed in subsection (c) apply, the child has been in the custody of the secretary and placed with neither parent for 15 of the most recent 22 months beginning 60 days after the date on which a child in the secretary's custody was removed from the child's home." K.S.A. 38-2269(b)(9).*

There is no dispute that N.M., E.M., and Z.L. have been in the custody of the Secretary for more than 15 of the most recent 22 months. They have been in state custody continuously since November 2019. And it has been Father's failure to complete reintegration tasks that has prevented him from obtaining custody.

IV. *There was clear and convincing evidence for the district court to find that Father's unfitness was unlikely to change in the foreseeable future.*

Next, we turn to whether the district court correctly found that Father's unfitness was unlikely to change in the foreseeable future. See K.S.A. 38-2269(a). Father minimally addresses this point in his brief but nonetheless contends the court erred and abused its discretion in terminating his parental rights.

When assessing whether a parent's unfitness is unlikely to change in the foreseeable future, courts liberally construe the Code to "acknowledge that the time perception of a child differs from that of an adult and to dispose of all proceedings under

16

this code without unnecessary delay." K.S.A. 38-2201(b)(4); see also *In re E.L.*, 61 Kan. App. 2d 311, 328, 502 P.3d 1049 (2021) (courts can look to a parent's past conduct as an indication of future behavior and use "'child time' when assessing the foreseeable future"). Other than a conclusory assertion, Father offers no explanation as to how the district court erred in assessing whether his unfitness was unlikely to change in the foreseeable future. It is clear when reviewing the entire record, that Father made very little progress in adjusting his conduct, completing reintegration tasks, and improving the relationship with his children from 2018 to 2023. Given his past conduct and the significant portion of their lives that all three children have spent in foster care, we find clear and convincing evidence supports the district court's finding that his unfitness was unlikely to change in the foreseeable future.

V.      *Termination of Father's parental rights was in the best interests of his children.*

Finally, we turn to the district court's conclusion that termination of Father's parental rights was in his children's best interests. See K.S.A. 38-2269(g)(1). A court making a best interests determination must give primary consideration to the physical, mental, and emotional needs of the child. K.S.A. 38-2269(g)(1). This decision rests within the sound discretion of the district court, which makes the decision based on a preponderance of the evidence. *In re R.S.*, 50 Kan. App. 2d at 1116. On appeal, we review the district court's best interests finding for an abuse of discretion. 50 Kan. App. 2d at 1115-16. A district court exceeds its discretion if its ruling stems from an error of law or fact or is "arbitrary, fanciful, or unreasonable." *Northern Natural Gas Co. v. ONEOK Field Services Co.*, 296 Kan. 906, 935, 296 P.3d 1106 (2013). Father does specifically identify any legal or factual errors allegedly committed by the district court. Thus, we will consider whether no reasonable person would reach the same conclusion as the district court. *In re R.S.*, 50 Kan. App. 2d at 1116.

Here, the district court's written order terminating Father's parental rights mirrored the required statutory findings, but the court expanded on its findings at the termination hearing. The court explained that "[m]ost of the children's lives have been in a stable home environment, unfortunately not with father, but that being in a foster home meeting their needs." The court further explained termination was in the children's best interests based on the testimony about the children's behavior before and after visits with Father, his minimal contact at school events and extracurricular activities, and the chaotic family therapy sessions. According to the court, this testimony showed that "it's detrimental to the children's wellbeing to be in the system so long with father not changing his conduct, condition, or circumstances to meet the needs of those children." These findings are all supported by the record, as explained above. Accordingly, we find that the district court did not abuse its discretion in finding termination of Father's parental rights was in the best interests of N.M., E.M. and Z.L.

Affirmed.